93 N.J. Super. 150 (1966)
225 A.2d 162
THE FIRST NATIONAL BANK OF BAY SHORE, A NATIONAL BANKING ORGANIZATION, PLAINTIFF,
v.
NORMAN STAMPER, ARTHUR J. SHARP, GEORGE C. FITZGERALD, JUNE STRELECKI, DIRECTOR, DIVISION OF MOTOR VEHICLES OF THE STATE OF NEW JERSEY AND FIRST COUNTY NATIONAL BANK & TRUST COMPANY, WOODBURY, DEFENDANTS.
Superior Court of New Jersey, Law Division.
Decided November 14, 1966.
*153 Mr. Robert S. Fisher, attorney for plaintiff.
Mr. Edward Suski, Jr., for defendant Arthur J. Sharp (Messrs. Cahill, Wilinski & Mohrfeld, attorneys).
MARIANO, J.S.C.
This matter is submitted to the court for its determination upon the following agreed statement of facts:
1. On October 11, 1962 Babylon Auto Sales, Inc., as seller, sold to defendant Norman Stamper, as buyer under a retail installment contract (herein called the contract) a 1959 Thunderbird automobile, Serial No. H9YJ155215 (herein called the Thunderbird), which contract reserved a security interest to the seller pending full payment of the purchase price.
2. On October 11, 1962 Babylon Auto Sales, Inc. assigned the contract and its interest in the Thunderbird to plaintiff.
3. Stamper at that time resided with his wife and children at 206 Bayshore Road in North Babylon, within the Town of Babylon, Suffolk County, New York, and plaintiff therefore *154 perfected its reservation of title to the Thunderbird by filing the contract with the town clerk of Babylon on October 22, 1962.
4. Paragraph 9 of the contract required Stamper to keep the Thunderbird garaged principally in Suffolk County, where he resided at the time the contract was made. In accordance with this requirement Stamper on October 13, 1962 procured a certificate of registration for the Thunderbird under the New York Motor Vehicle Law, which he renewed on December 28, 1962.
5. On or about January 1, 1963 Stamper moved temporarily to Pennsauken, New Jersey, where he resided with a relative for two months. His family remained in Babylon. Stamper did not permanently change his residence to New Jersey until he moved with his family to Westville, New Jersey, on or about March 1, 1963, into premises which he leased.
6. Without plaintiff's knowledge or consent, Stamper on or about January 7, 1963 applied for and received from the New Jersey Division of Motor Vehicles a New Jersey certificate of ownership showing him as the owner of the Thunderbird and failing to reflect plaintiff's reservation of title. The certificate of ownership, issued by the Division on January 7, 1963 and covering the Thunderbird, bore the number 8352418 Z. The "Z" at the end of the number is the symbol used by the Division to indicate that a vehicle was previously registered in another state. This certificate was presented to defendant Sharp on January 18, 1963, when he purchased the Thunderbird from Stamper.
7. On or about January 18, 1963 Stamper, prior to his permanent removal from the State of New York and less than three weeks after his temporary removal to the State of New Jersey, sold the Thunderbird to Sharp, who purchased it without plaintiff's knowledge or consent and without knowledge of plaintiff's security interest.
8. Sharp thereafter applied for and received on January 18, 1963 a New Jersey certificate of ownership showing him *155 as the owner of the Thunderbird and failing to show plaintiff's reservation of a security interest.
9. Between January 18 and March 21, 1963 Sharp sold the Thunderbird to defendant Fitzgerald, who applied for and received from the Division of Motor Vehicles a New Jersey certificate of ownership showing him as the owner of the Thunderbird and defendant First County National Bank and Trust Company of Woodbury, New Jersey, as lien holder, and failing to reflect plaintiff's reservation of a security interest.
10. Stamper made the installment payments due under the contract until May 11, 1963.
11. Plaintiff did not learn until November 17, 1963 that Stamper had moved to New Jersey, and was not able to locate him until December 7, 1964. It did not learn that Fitzgerald was in possession of the Thunderbird until December 4, 1963. Plaintiff has made numerous vain efforts to serve a demand for possession on Fitzgerald, who has moved to and fro between New Jersey, Florida and now Pennsylvania. However, plaintiff has demanded payment from Sharp of the reasonable value of the Thunderbird, which demand has been refused.
12. Plaintiff on November 29, 1963 caused to be filed in the office of the Secretary of State of New Jersey a financing statement covering the Thunderbird.
13. Plaintiff has sustained damages as follows:
(a) As against Stamper, $1,829.82 plus late charges as provided in the contract (5% of each scheduled monthly installment delinquent for ten or more days), plus an attorney's fee of 15% of the above amount as provided in the contract, plus punitive damages.
(b) As against Sharp, $1,275 as the reasonable value of the Thunderbird on the date it was bought and converted by him.
(c) As against Fitzgerald, $1,295 as the reasonable value of the Thunderbird on the date it was bought and converted by him.
*156 14. Sharp did not have actual knowledge of the security interest of plaintiff in the Thunderbird at the time he purchased the car from Stamper and sold it to Fitzgerald.
The only method available for recording liens on motor vehicles with the Director of Motor Vehicles is to issue a certificate of ownership noting the lien.
The Division of Motor Vehicles is not geared, nor indeed is it required, to seize and take from an innocent purchaser for value a certificate of ownership issued by the State for the purpose of recording a lien. When the lienholder presents a financing statement, form CO 85 C, and the certificate of ownership to the Division, title would be issued noting the lien. See letter of Division of Motor Vehicles submitted by stipulation.
Fitzgerald, the present possessor of the automobile, is not involved in this litigation.
Stamper cannot be located, and therefore plaintiff is seeking in this action to recover damages against Sharp for conversion.
Sharp contends that the remedy of a wrongful conversion is unavailable to plaintiff and that its only remedy is against Stamper, the original buyer. The elements of a conversion action are clearly stated in McGlynn v. Schultz, 90 N.J. Super. 505, 525 (Ch. Div. 1966), and Mueller v. Technical Devices Corp., 8 N.J. 201 (1951). Defendant insists that intent is a necessary element to a wrongful conversion action, citing Gunther v. Morey Larue Laundry Company, 129 N.J.L. 345 (Sup. Ct. 1943), affirmed 130 N.J.L. 557 (E. & A. 1943). The elements of good faith, intent or negligence are clearly discussed in McGlynn:
"* * * While an intent to convert consummated by some positive act, is necessary to constitute conversion, it is very generally held that it is not essential to conversion that the motive or intent with which the act was committed should be wrongful, or willful or corrupt, although, as in actions for damages for torts generally, * * * factors of this character may be taken into consideration in determining whether exemplary damages shall be allowed.
*157 It is sufficient if the owner has been deprived of his property by the act of another assuming an unauthorized dominion and control over it. It is the effect of the act which constitutes the conversion. In consequence * * * it has very generally been held that the question of good faith, and the additional questions or elements of motive, knowledge or ignorance, or care or negligence, are not involved in actions for conversion.

* * * * * * * *
The general rule is that one who exercises unauthorized acts of dominion over the property of another, in exclusion or denial of his rights or inconsistent therewith, is guilty of conversion although he acted in good faith and in ignorance of the rights or title of the owner. The state of his knowledge with respect to the rights of such owner is of no importance, and cannot in any respect affect the case. * * *" (at p. 526)
Thus, defendant's argument as to the necessary intent in a conversion action is without merit.
Sharp next contends that plaintiff must have an immediate right to possession in order to maintain the conversion action, citing First National Bank of Bloomingdale v. North Jersey Trust Company, Ridgewood, 18 N.J. Misc. 449, 14A 2d 765 (Sup. Ct. 1940). This problem is considered in Prosser, Law of Torts (3d ed. 1964):
"The common law rule was extended to permit recovery by one who had the immediate right to possession, as in the case of a bailor entitled to possession on demand, or a chattel mortgagee or conditional seller after default. But an owner who had neither possession nor the immediate right to it at the time of the conversion could not maintain trover. His remedy was an action on the case for the damage to his interest in the goods. Although the distinction persists today in a good many courts, it is an antique procedural survival, with nothing to recommend it. The important fact is that the man entitled only to future possession can recover, in whatever form of action, the full value of his interest in the goods which has been appropriated by the defendant, and no more. If this is not to be called conversion, it is at least the same thing by another name. There are a substantial number of courts which have discarded the procedural distinction, and have called the action one of conversion." (at pp. 96-99)
Additionally, in the case of Van Syckle v. Keats, 125 N.J.L. 319 (Sup. Ct. 1940), plaintiff sold an auto to one Blanchard on a conditional bill of sale on June 2, 1936, *158 reserving title to himself. On June 20, 1939, over three years later, defendant Keats foreclosed a chattel mortgage on the auto which had been given by the conditional vendee subsequent to the conditional purchase. Plaintiff recovered the value of the auto against Keats in a conversion action. See also Al Maroone Ford Inc. v. Manheim Auto Assoc. Inc., 205 Pa. Super. 154 (Super. Ct. 1965), where it was held that assignee's security interest in an automobile under installment sale to New York buyer was perfected when seller bought automobile from New York buyer, plaintiff's purchase was subject to security interest, and sale of automobile by plaintiff was conversion of an automobile as against assignee.
In any event, plaintiff was entitled to immediate possession on or about January 1, 1963 when, contrary to the following provision of the conditional sales contract (Exh. A, par. 9), he brought the car into New Jersey:
"Default shall exist hereunder * * *
(a) If the buyer shall or shall attempt to [remove] or allow removal of the vehicle from the county where the buyer now resides. * * *"
Another contention of defendant is that by virtue of N.J.S. 12A:9-311 a conditional vendee has an absolute right to convey the chattel, and thus an action in conversion is not maintainable.
N.J.S. 12A:9-311 reads as follows:
"The debtor's rights in collateral may be voluntarily or involuntarily transferred (by way of sale, creation of a security interest, attachment, levy, garnishment or other judicial process) notwithstanding a provision in the security agreement prohibiting any transfer or making the transfer constitute a default."
The purpose of this section is clearly stated in the New Jersey Study Comment to this Code provision:
*159 "1. The purpose of this section is to state the rule that the debtor has an interest which may be either voluntarily transferred or reached by the creditors of the debtor. In addition § 9-311 declares void any provision in the security agreement either prohibiting transfer or making the transfer constitute a default.
2. Section 9-311 restates so much of the present New Jersey rule as declares that the interest of the debtor may be reached by appropriate legal process despite an outstanding valid security interest. * * *"
This section does not give the conditional vendee the right to sell a chattel free of plaintiff's security interest, but rather it sanctions sale or other creditor remedies against the debtor's equity in the chattel. This restates prior New Jersey law. Farrow v. Ocean County Trust Co., 121 N.J.L. 344 (Sup. Ct. 1938).
Sharp was not a buyer in the ordinary course of business which would permit him to take free of a security interest. A buyer in the ordinary course of business is defined in N.J.S. 12A:1-201(9) of the Code as "a person who in good faith and without knowledge that the sale to him is in violation of the ownership rights or security interest of a third person in the goods, buys in ordinary course from a person in the business of selling goods of that kind * * *." Clearly, defendant was not a buyer in the ordinary course when he purchased the Thunderbird from Stamper, because it was not bought in the ordinary course from a person in the business of selling goods of that kind.
This case presents the question of the right of the assignee of the conditional vendor of an automobile whose security interest therein had been perfected in accordance with the law of the state in which the automobile had been sold, to sue for conversion where the vendee, without the vendor's or his assignee's knowledge or consent, had taken the automobile to another state and sold it to a purchaser for value who was unaware of an outstanding conditional sales contract.
New York law governs the initial perfection of plaintiff's security interest because Stamper, the purchaser, lived in New York, the automobile had its situs in New York, and *160 the execution and filing of the contract took place in New York. The original sale took place on October 11, 1962, before the adoption of the Uniform Commercial Code in the State of New York. Section 66 of the New York Personal Property Law provided that "every conditional sales contract or a copy thereof * * * must be filed in the office of the City Clerk or Town Clerk in the city or town in which the buyer resides, if he resides within the state at the time of the execution thereof * * *." Stamper resided in the hamlet of North Babylon at the time of the execution of the contract, and since the hamlet lies within the Town of Babylon, the filing with the clerk of Babylon was in accordance with New York law. Section 64 of the New York Personal Property Law, McKinney's Consol. Laws, c. 41, provided that such filing, when made, was valid as to all persons except as otherwise specified, and the only contrary specification is contained in section 65 as to purchasers or attaching or levying creditors of the buyer without notice before filing, unless filing is accomplished within ten days after the sale. The filing in the instant case took place on October 22, 1962. Plaintiff fully complied with the New York requirements and thus perfected its security interest and right to possession of the Thunderbird, and plaintiff's security interest was valid against all persons under the New York law.
The car was not covered by a certificate of title on which plaintiff's security interest was noted in New York because New York lacks a statutory requirement providing for such manner of perfecting a security interest in motor vehicles. New Jersey does have such a statute. See N.J.S.A. 39:10-11.
As noted, on January 1, 1963 Stamper temporarily moved to Pennsauken, New Jersey, where he remained for two months. On or about March 1, 1963 he permanently moved with his family to Westville, New Jersey. On or about January 7, 1963 he applied for and received from the New Jersey Division of Motor Vehicles a certificate of ownership showing him to be the owner of the Thunderbird, which certificate *161 failed to reflect plaintiff's reservation of title. On or about January 18, 1963 Stamper sold the automobile to Sharp, who received a New Jersey certificate of ownership which likewise failed to show plaintiff's reservation of a security interest. The certificate of ownership presented by Stamper to Sharp bore the letter "Z," a symbol used by the Division of Motor Vehicles to indicate that the vehicle was previously registered in another state.
The resale by Stamper took place in New Jersey; therefore, the answer to the question turns upon the construction of the Uniform Commercial Code, adopted in New Jersey on January 1, 1963.
Prior to the adoption of the Uniform Commercial Code the generally prevailing rule was that the interest of the conditional vendor would be protected in the circumstances stated. Conditional sales agreements usually prohibited the vendee from taking the automobile out of the state without the vendor's consent. The conditional vendor in such a case would have no reason to anticipate that the vendee would take the automobile out of the state and, in the absence of said notice of removal, he would have no opportunity to file the contract in the state to which the automobile had been taken, prior to its resale. The risk of loss was thrown upon the person who purchased the automobile from the wrongdoing vendee. 78 C.J.S., Sales, § 568, page 281. There were a few jurisdictions which threw the risk of loss upon the conditional vendor, and in those states the purchaser from the conditional vendee was held to have acquired title superior to the interest of the conditional vendor, because the vendor had not filed the contract in accordance with the law of the state to which the automobile had been taken.
The Uniform Commercial Code chose a middle course between the majority and minority views in an endeavor to arrive at a fair compromise between the conflicting interests of the conditional vendor or his assignee and the purchaser from the vendee. N.J.S. 12A:9-103(3) of the Uniform Commercial Code reads as follows:
*162 "If personal property other than that governed by subsections (1) and (2) is already subject to a security interest when it is brought into this state, the validity of the security interest in this state is to be determined by the law (including the conflict of laws rules) of the jurisdiction where the property was when the security interest attached. However, if the parties to the transaction understood at the time that the security interest attached that the property would be kept in this state and it was brought into this state within 30 days after the security interest attached for purposes other than transportation through this state, then the validity of the security interest in this state is to be determined by the law of this state. If the security interest was already perfected under the law of the jurisdiction where the property was when the security interest attached and before being brought into this state, the security interest continues perfected in this state for four months and also thereafter if within the four month period it is perfected in this state. The security interest may also be perfected in this state after the expiration of the four month period; in such case perfection dates from the time of perfection in this state. If the security interest was not perfected under the law of the jurisdiction where the property was when the security interest attached and before being brought into this state, it may be perfected in this state; in such case perfection dates from the time of perfection in this state."
As will be seen, the draftsmen of the Code decided that the conditional vendor ought to try to keep track of the property covered by the conditional sales agreement, and if he discovered that the property had been taken to another state, he ought to take reasonable steps to give notice to the public of his interest, in accordance with the laws of that state. On the other hand, subsequent purchasers and lienors in the state to which the property had been taken would have to take the risk of there being an outstanding security interest in the state from which the property had come, if they purchased the property or acquired a lien upon it shortly after it had been brought into the state and before the vendor or his assignee had an opportunity to discover the facts and to perfect his security interest in accordance with the laws of the state. A four-month period was chosen as a reasonable period within which the vendor ought to be able to locate the property and perfect his security interest in the state to which the property had been taken. Thereafter, if he had not done so, his interest, although originally perfected in the state in *163 which it attached, is subject to defeat here by those persons who take priority under an unperfected security interest. See N.J.S. 12A:9-301. The security interest may also be perfected after the expiration of the four-month period, and in such case perfection dates from the time of the perfection in this State.
The four-month period under the Uniform Commercial Code is different from the ten-day grace period allowed under the former Conditional Sales Law for the original filing of a conditional sales contract. The four-month period provided in subsection 3, above, is an absolute period of protection of the vendor's security interest, designed to give him adequate time to make an investigation and locate the property. If the vendor fails to file within the four-month period, the protection of his security interest ceases upon the expiration thereof, and his unperfected security interest is thereafter subject to be defeated in the same way in which any unperfected security interest may be defeated under the Code. A subsequent purchaser for value, without notice of the unprotected security interest, would take a superior title. N.J.S. 12A:9-301, 9-307, 1-201(9). But, a prior purchaser who had purchased during the four-month period of statutory protection is not retroactively given a superior title.
It appears from the foregoing, including the stipulation of facts, that all the transactions in this State with respect to the automobile took place within four months from the time when it was brought here; therefore, under the provisions of the quoted statute the security interest of the conditional vendor was entitled to full protection in New Jersey. The interest having been perfected in New York, the state in which the automobile had been kept "before being brought into this state," the security interest continued "perfected for four months" after being brought into New Jersey. Thus, Sharp took subject to the outstanding interest of the assignee of the conditional vendor. See Churchill Motors Inc. vs. A.C. Lohman, Inc., 16 A.D.2d 560, 229 N.Y.S.2d 570 (App. Div. 1962); Casterline v. General *164 Motors Acceptance Corp., 195 Pa. Super. 344, 171 A.2d 813 (Super. Ct. 1961), Al Maroone v. Manheim Auto Assoc. Inc., supra. Sharp is not in the same position as a subsequent purchaser who acquired his interest after the expiration of the four-month statutory period.
Defendant argues that the perfection of the security interest is governed by the law of the jurisdiction which issued the certificate, and cites as authority General Motors Accept. Corp. v. Manheim Auction, 25 D & C 2d. 179 (Pa. C.P. 1961), basing his argument on the fact that the Commissioner of Motor Vehicles of New Jersey issued a certificate of title to Stamper on January 7, 1963 without any notation of a security interest.
N.J.S. 12A:9-103(4) provides:
"Notwithstanding subsections (2) and (3), if personal property is covered by a Certificate of Title issued under a statute of this state or any other jurisdiction which requires indication on a Certificate of Title of any security interest in the property as a condition of perfection, then the perfection is governed by the law of the jurisdiction which issued the certificate."
It is plaintiff's contention that this provision is not applicable in a situation where a car is brought from a non-title state to a title state such as New Jersey. Churchill Motors, Inc. v. A.C. Lohman, Inc., supra.
The Editorial Board of the Uniform Commercial Code states the purpose of section 4 as follows:
"Subsection 4 is new to avoid the possible necessity of duplicating perfection in the case of a vehicle subject to a certificate of title law requiring compliance therewith to perfect security interest. The certificate of title law requirements are adopted as the test for perfection."
The note by the draftsmen makes clear that subsection 4 does not have application to an automobile which was sold under a conditional sales contract in a state which does not require "indication on a certificate of title of any security interest in the property as a condition of perfection," and *165 which was subsequently brought into a state which had such a requirement.
The New Jersey Study Comments to N.J.S. 12A:9-103 states that subsection 4 restates the law of New Jersey as it existed prior to the adoption of the Code. In Mygirack v. Lepore, 6 N.J. Super. 505 (Law Div. 1949), the court specifically enunciated the policy of this State as follows:
"* * * the great weight of authority is to the effect that a chattel mortgage, properly executed and recorded according to the law of the place where the mortgage is executed and the property is located, will, if valid there, be held valid even as against creditors and purchasers in good faith in another state to which the property is removed by the mortgagor, unless there is some statute in that state to the contrary or unless the transaction contravenes the settled law or policy of the forum. There being no evidence of fraud, and it appearing that the transaction violated neither the settled law or policy of this state, I am forced to the conclusion that the chattel mortgage registered in New York was a valid and subsisting lien at the time of the sale to the plaintiff."
It is to be noted that the language of section 9-103(3) of the Code makes it clear that the requirements of N.J.S.A. 39:10-11 with regard to a notation of a security interest of a motor vehicle on a title certificate no longer applies to an interest obtained outside of New Jersey in circumstances such as we have before us in states which have no provisions for such notations. In re Casterline v. General Motors Acceptance Corp., supra.
For the reasons above expressed, in addition to the reasoning and logic of the Churchill case, it is concluded that the defendant never acquired superior title to that of the conditional vendor or its assignee. Accordingly, the said assignee is entitled to a judgment against Sharp in the agreed sum of $1,275, with interest.