[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM FILED APRIL 18, 1997
By Memorandum of Decision dated March 7, 1997, this court found jurisdiction lacking because there had not been proper proof that adequate notice had been given to parties in this action for a declaratory judgment. Practice Book § 390(d). Rather than dismiss the action, the court granted the plaintiff the opportunity to cure that defect. The Connecticut Ins.Guaranty Assn. v. Raymark Corporation, 215 Conn. 224,575 A.2d 693 (1990).
The plaintiff has filed an affidavit which assures the court that Practice Book § 390(d) has now been complied with, permitting the court to undertake a review of the substantive arguments raised by the parties' motions for summary judgment and to decide those motions.
The salient facts and procedural history of this case were set forth in the court's March 7, 1997 Memorandum of Decision and CT Page 3756 will not be repeated here, but rather, they are incorporated by reference into this memorandum. Briefly stated, however, the plaintiff, who insures Stamford Propane, Inc. in several suits brought by the defendants in this case to recover for injuries suffered after a propane gas explosion, claims that the accident is not covered under the policy because of limitations found in Endorsement 11 of the policy.
The "construction of a contract of insurance presents a question of law for the court." Flint v. Universal Machine Co.,238 Conn. 637, 642, 679 A.2d 929 (1996). "It is the function of the court to construe the provisions of the contract of insurance." (Internal quotation marks omitted.) Id. "Under our law, the terms of an insurance policy are to be construed according to the general rules of contract construction." HeymanAssociates No. 1 v. Insurance Co. of Pennsylvania, 231 Conn. 756,769-70, 653 A.2d 122 (1995). "The court must interpret the insurance contract as a whole with all relevant provisions considered together." Schultz v. Hartford Fire Ins. Co.,213 Conn. 696, 705, 569 A.2d 1131 (1990). "It is axiomatic that a contract of insurance must be viewed in its entirety, and the intent of the parties for entering it derived from the four corners of the policy." Flint v. Universal Machine Co., supra,238 Conn. 643.
"The determinative question is the intent of the parties, that is, what coverage the . . . [plaintiff] expected to receive and what the defendant was to provide, as disclosed by the provisions of the policy . . . If the terms of the policy are clear and unambiguous, then the language, from which the intention of the parties is to be deduced, must be accorded its natural and ordinary meaning . . . However, [w]hen the words of an insurance contract are, without violence, susceptible of two [equally responsible] interpretations, that which will sustain the claim and cover the loss must, in preference, be adopted." (Citations omitted; internal quotation marks omitted.) HeymanAssociates No. 1 v. Insurance Co. of Pennsylvania, supra,231 Conn. 770.
At issue is the scope of the limitations clause in Endorsement 11, which reads, "coverage under this policy is limited to the following: operations relating to the sale, distribution, handling, installation, servicing or storage of LPG [liquid propane gas] or equipment supplied by Synergy Group, Inc. and its affiliated companies." CT Page 3757
In its complaint, at paragraph 14, American Home claims that Endorsement 11 limits the coverage to "only those aspects of the propane business involving the actual storage and sale of the gas, and was not meant to extend to the day-to-day operations" of the business. Explaining this limitation further, American Home asserts that "[t]he purpose of this policy was to provide the vendors (or refillers) of LPG with insurance coverage when the vendors were physically selling the LPG at the vendor sites." (Plaintiff's Brief of Sept. 26, 1996, p. 2.) American Home argues that only incidents having to do with the dispensing and sale of propane are covered, and such activity was not occurring at the time of the explosion nor was such activity the cause of the explosion. Because the explosion occurred as the result of the use of propane to heat the premises, rather than in the course of dispensing it to a customer, American Home claims that the incident belongs in the realm of Stamford Propane's day-to-day business operations, and is thus excluded by the limiting language of Endorsement 11.
The defendants assert that the phrase "day-to-day operations" is neither mentioned nor defined in the policy. They argue that Stamford Propane was at all times engaged in the sale, handling and storage of propane gas, and thus Stamford Propane's mishandling of the propane heater on the premises was an activity "related to" the storage and handling of propane. They argue further that the language is not ambiguous, but that even if the court were to find some ambiguity in the language, the rules of construction require that it be construed in favor of the insured.
Endorsement 11 contains a list of general activities having to do with propane — "sale, distribution, handling, installation, servicing or storage." Indeed, this list covers most activities a retail vendor of propane might engage in. Likewise, the phrase "operations relating to" lends itself to a broad construction. "Operations" is defined as "the whole process of planning for and operating a business or other organized unit," and to "relate to" means simply to have a connection with or reference to. Webster's Third International Dictionary. Giving "operations" its broadest meaning, any activity Stamford Propane engaged in to effect its business purpose of selling propane would be an operation relating to the sale, handling, or storage of propane, as argued by the defendants. Heating a building out of which one conducts a retail propane business would therefore come under the coverage CT Page 3758 of the policy, unless there were some explicit language or commonly understood reason to exclude it.
The language of Endorsement 11 does not make an explicit reference to "day-to-day operations," nor does American Home attempt to define "day to day operations," though in the course of its arguments, it sets up an implicit distinction, presumably mutually exclusive, between "day-to-day operations" and "operations relating to the sale, etc. of LPG," and suggests that this implied distinction was the premise of the policy. According to the logic of American Home, the handling or storage of propane had to be directly connected to the sale of propane to the general public, not related to the operation of the physical establishment from which it conducted its sales operations. This is a very subtle distinction, and any number of incidents might happen that would be difficult to classify according to this scheme. In addition to the lack of clarity in the distinction, there is simply no language in Endorsement 11 that limits the "operations" in the way that American Home insists.
But this seems to be as far as the language takes us. While it cannot support American Home's contention, neither can it be read as encompassing all of the business activities of Stamford Propane simply because all of its "operations" relate to its main business purpose, which is the sale of propane. To read it this way would render Endorsement 11 redundant in the context of the policy, because without Endorsement 11, the policy, as a general commercial liability policy, would cover all the activities related to the insured's main business purpose. See Cooper v.RLI, Superior Court, judicial district of New Haven, Docket No. 617028 (June 3, 1996, Corradino, J.).
This may be what American Home is insisting on when it says that the policy does not cover day-to-day operations. It submitted an affidavit with its motion in which Carl Ludders, an underwriter for American Home, avers that if the policy were a general premises liability policy then a greater premium would have been charged. (Plaintiff's Memorandum, Sept. 26, 1996, Exhibit C.) Although the price of a policy may sometimes be a reasonable indicator of the limits of coverage,[1] Mr. Ludders' averment speaks only of c higher premium for a blanket premises liability policy As stated above, without Endorsement 11, the policy would be such a policy, as it declares itself on page 1 to be a "commercial general liability policy." In this respect, then, American Home is right that the policy does not cover what CT Page 3759 could be termed "day-to-day operations" of the business because it is not a blanket premises liability policy. Many things that could happen on the premises in the course of daily business would not be covered, such as a customer falling on some defective noor covering, or a fire caused by faulty electrical wiring.
Establishing that, however, still does not establish the exact meaning of the limitation as expressed in the policy. For that, the other extrinsic evidence offered by American Home, a blank application form like that which Stamford Propane would have submitted,[2] provides some insight. While the meaning of an insurance policy is to be derived from the "four corners of the policy," Flint v. Universal Machine Co., supra,238 Conn. 643, the court may look beyond the policy when necessary to aid in interpretation. "Provisions of the policy . . . cannot be construed in a vacuum . . . They should be construed from the perspective of a reasonable layperson in the position of the purchaser of the policy." (Citations omitted.) Ceci v. NationalIndemnity Co., 225 Conn. 165, 168, 225 A.2d 165 (1993). There must be "careful consideration of the situation [of the parties] to that policy and the circumstances connected with the transaction." (Internal quotation marks omitted.) Id., 769-70. The use of an application for this purpose was recently discussed in Cooper v. RLI, supra. In Cooper, a restaurant owner was sued by a patron who had been injured on the dock of a marina doing business on the same premises as the restaurant. The insurer, who had provided a commercial general liability policy, denied coverage, claiming that the policy, having been issued to the restaurant owner, was not intended to cover incidents involving a marina. Looking at the application, the court noted that all the questions concerned the nature of the business. with specific questions concerning activities a restaurant might engage in, rather than the extent of the premises, and concluded that it was reasonable to assume that both parties intended to insure only the activities of the business, rather than to provide blanket premises liability.
In the present case, American Home offers the application to explain the limitations embodied in Endorsement 11. It points to a note on the application that describes the type of coverage the policy will provide. The note reads: "This insurance contract applies only to the operations of storage sales and dispensing LP gas. Coverages offered are products and completed operations and O.L. T. premises liability for the tank, its appurtenances and CT Page 3760 that area serviceable by the dispensing hose, not to exceed a radius of 20' from the discharge connection of the pump. " American Home would have this language imported into the contract, but the language of the note does not appear in the contract, and its phrasing is different enough from the language of Endorsement 11 that it would amount to a new and different term for the contract. Although the parol evidence rule does not bar the use of extrinsic evidence to aid in the interpretation of contractual language, it "prohibits the introduction of evidence that varies or contradicts an exclusive written agreement." (Internal quotation marks omitted.) Hare v. McClellan,234 Conn. 581, 596, 662 A.2d 1242 (1995).
The application does assist, however, in divining the reasonable expectations of a layperson acquiring the policy. To begin with, Stamford Propane was able to obtain this insurance because it was a vendor for Synergy Gas Corporation. The named insured on the first page of the policy is "Refillers of Synergy Group" and Endorsement 11 lists the approximately 90 retail vendors of propane who obtain their product from Synergy. The fact that the retailer obtained the insurance through its distributor rather than directly from an insurance company gives some substance to an understanding that the insurance would cover incidents having to do with the product, which in this case is a highly flammable substance. Other questions on the application are all geared specifically to the storage and handling of propane by the vendor, such as the amount of propane sold annually, storage capacity, and whether employees are trained in liquid propane gas dispensing operations. While none of these indications derived from the application may be definitive, there is no direct language in either the application or the policy on how, if at all, American Home expected the handling of propane to be limited to customer sales. The incident with the propane space heater may have been the result of the "use" of propane rather than the "retailing" of propane, but the policy language, with its inclusion of broad terms such as "storage" and "handling," nowhere indicates that the use of propane in the course of business is to be excluded from coverage.
A final consideration when seeking to determine what a reasonable layperson would expect an insurance policy to cover is the type of risks that one in this business would be concerned about insuring against. "[T]he meaning of policy language should ordinarily be drawn from the context in which it is used." AetnaLife Casualty Co. v. Bulaong, 218 Conn. 51, 61, 588 A.2d 138
CT Page 3761 (1991). Surely the dangers of handling propane gas is of major concern to retail vendors. It's not as if the retailer were dealing in something less volatile like housewares that would be unlikely to pose such high risks in the actual transactions with the general public. The parties must have contemplated that were an accident to occur involving the propane, the possibility of substantial injuries to third parties not involved in the specific transaction would be high.[3] To insure against the risks of selling propane to the general public must include the fisk of explosion with its attendant, and usually costly, injuries. Perhaps the insurer did not contemplate the risks of having a propane heater on the premises, but it cannot be read into the policy after the fact that such an appliance does not come under the phrase "operations relating to the storage and handling of LPG."
American Home's interpretation of the language in Endorsement 11 is not supported by the language itself nor by a reasonable interpretation of the circumstances. Further, the language of Endorsement 11, while perhaps not exactly ambiguous, is vague and susceptible of different meanings because it is broad and all-inclusive. "If the terms of an insurance policy are of doubtful meaning, that permissible construction which is most favorable to the insured is to be adopted." (Internal quotation marks omitted.) Rydingsword v. Liberty Mutual Insurance Co.,224 Conn. 8, 15, 615 A.2d 1032 (1992). Given this rule, the policy should be construed to provide coverage, unless such a construction is itself unreasonable. A reasonable interpretation of the intention of the policy is that it was to insure against the inherent risks of dealing with propane gas. The underlying complaints allege that the incident occurred when an employee of the insured, Stamford Propane, mishandled a propane connection. This was an operation related to the storage and handling of propane and thus comes under the coverage of the liability policy issued by American Home.
The plaintiffs motion for summary judgment is denied, and the motions for summary judgment of the defendants are granted.
D'ANDREA, J.