HEYMAN ASSOCIATES NO. 1 *v.* INSURANCE COMPANY OF THE STATE OF PENNSYLVANIA ET AL.
(14938)

PETERS, C. J., and CALLAHAN, BERDON, KATZ and PALMER, Js.

---

Argued September 27, 1994—decision released January 17, 1995

*Jerold Oshinsky*, pro hac vice, with whom were *Steven Berglass, Andrew M. Reidy*, pro hac vice, and, on the brief, *Michelle M. Jardine*, pro hac vice, for the appellant (plaintiff).

*Thomas J. Groark, Jr.*, with whom were *Jonathan Tropp, Michael J. McManus*, pro hac vice, and, on the brief, *Frank Santoro, Kathleen Munroe, M. Elizabeth Medaglia*, pro hac vice, and *Richard S. Kuhl*, pro hac vice, for the appellees (defendants).

*Scott P. Moser, David J. Elliott, Laura A. Foggan,* pro hac vice, *Daniel E. Troy,* pro hac vice, and *John C. Yang,* pro hac vice, filed a brief for the Insurance Environmental Litigation Association as amicus curiae.

KATZ, J. This appeal arises from a dispute over whether "absolute pollution" exclusions in the plaintiff's commercial liability policies with the defendants exclude coverage for damages caused by a fuel oil spill from the plaintiff's property into Stamford Harbor. The plaintiff, Heyman Associates No. 1, brought suit against the defendants, the Insurance Company of the State of Pennsylvania (ISOP) and National Union Fire Insurance Company of Pittsburgh, Pennsylvania (National Union), after the defendants denied coverage based on the exclusions. Both the plaintiff and the defendants moved for summary judgment on select counts of the plaintiff's six count complaint. The trial court ruled in favor of the defendants on both motions and rendered judgment nunc pro tunc on the remaining counts. The plaintiff appealed and raises three primary issues for consideration. We affirm.

The following facts are not disputed. The plaintiff is a general partnership in the business of owning and operating commercial real estate. Late in January, 1991, the United States Coast Guard discovered that a large quantity of fuel oil had leaked from the plaintiff's property into Stamford Harbor. By letter dated February 1, 1991, the Coast Guard informed the plaintiff that as the party responsible for the spill, it was "liable for, among other things, removal costs and damages resulting from th[e] incident." In its letter, the Coast Guard required that, inter alia, the plaintiff "[i]dentify and remediate" the oil's impact on the water, shoreline and affected wildlife.[1] Further, the Coast

---

[1] The Coast Guard specified in its letter that "[a]s the responsible party for this incident, you are hereby directed to take the following initial actions:

Guard explained that under the Federal Water Pollution Control Act, the plaintiff's failure to remediate the incident or to comply with necessary administrative orders would subject it to substantial civil penalties. In response to the Coast Guard's letter, the plaintiff undertook the required remediation of the affected harbor area.

On February 14, 1991, the plaintiff sent to ISOP notice of a claim on its primary comprehensive general liability insurance policy in effect with ISOP.[2] On April 19, 1991, the plaintiff notified National Union of a claim on its excess liability policy in effect with National Union.[3] After numerous communications between the

"1. Remove fuel product from the storm drain system along its entirety . . . without causing further pollution of the harbor.

"2. Identify and remediate any ground saturation resulting from [the] incident.

"3. Continue the cleanup operation initiated by the Federal On-Scene Coordinator of the East Branch of Stamford Harbor. This cleanup operation involves removal of any remaining floating fuel product, the cleanup of any impacted shoreline area or any other floating or fixed structure or vessel, whether public or private. Specific direction concerning the remaining harbor cleanup operation will be provided by the Federal On-Scene Coordinator's representative.

"4. Respond to and provide treatment for any wildlife impacted by this pollution incident.

"5. Isolate and drain all fuel from the existing fuel system supplying the Boilers . . . ."

[2] The plaintiff's policy with ISOP, in effect from April 15, 1990, to April 15, 1991, provided for one million dollars of coverage per occurrence for liability claims. This policy imposed on ISOP a general duty to defend and to indemnify the plaintiff up to the policy limits on claims arising from covered "bodily injury" or "property damage."

[3] An excess liability policy, also known as an "umbrella" policy, provides coverage that is secondary to an insured's primary policy. Thus, coverage under an excess liability policy generally pays benefits only if the insured first exceeds the coverage limits on its primary policy.

The parties agree that National Union originally sold the plaintiff an excess liability policy with an effective period of coverage from April 15, 1989, to April 15, 1990. This policy provided for coverage limits of ten million dollars. The record, however, is unclear as to whether a version of that policy, or another policy, was in effect on the dates relevant to this case. It appears from the evidence that the original policy apparently was rewrit-

parties concerning the fuel oil spill and purported insurance coverage, ISOP denied coverage on March 13, 1991, and National Union denied coverage on June 10, 1991.[4] Each defendant denied coverage relying on an exclusion contained in its insurance policy with the plaintiff.[5]

---

ten, effective August 1, 1989, as two policies each providing for coverage limits of five million dollars through August 1, 1990. These rewritten policies were then extended to cover the period of time through August 1, 1991. National Union issued binders to confirm these new policies, but the plaintiff claims that it never received the policies themselves. Nonetheless, due to confusion following the oil spill over whether National Union actually had issued the two policies providing coverage limits of five million dollars, the original policy providing for coverage limits of ten million dollars was extended by endorsement to cover the period of time in question here.

[4] The parties disagree as to the nature, extent and implications of the communications between the plaintiff and ISOP during the period of time from the fuel oil spill to ISOP's eventual denial of coverage. The plaintiff contends that ISOP originally responded to its claim on the policy by sending "several dilatory letters requesting irrelevant information" and by ignoring its "repeated requests" for an "immediate response." ISOP retorts, however, that many of the plaintiff's purported communications actually were directed to the plaintiff's insurance brokers rather than to it. Further, ISOP suggests that it required the time and information only to determine under which policies the plaintiff was seeking coverage and to obtain those policies.

The plaintiff further contends that National Union first responded to its claim by sending a notice of cancellation due to nonpayment of premium. National Union apparently had canceled the policy on the basis of an erroneous belief that the plaintiff had not paid all of the premiums. When the plaintiff protested this cancellation, however, National Union extended by endorsement the original ten million dollar policy.

[5] The trial court found that the exclusion in effect in the ISOP policy provided in relevant part that the policy did not apply:

"(1) to 'bodily injury' or 'property damage' arising out of the alleged or threatened discharge, dispersal, release or escape of pollutants;

"(a) at or from premises you own, rent or occupy;

"(b) at or from any site or location used by or for you or others for the handling, storage, disposal, processing or treatment of waste material;

"(c) which are at any time transported, handled, stored, treated, disposed of, or processed as waste by or for you or any person or organization for whom you may be legally responsible; or

"(i) to test for, monitor, clean up, remove, contain, treat, detoxify, or neutralize the pollutants, or

In response to the denials of coverage, the plaintiff filed in the Superior Court a six count complaint against the defendants alleging that: (1) the policies issued by the defendants provide coverage for property damage claims, and that the defendants have failed to assume their obligation under the policies to defend and indemnify the plaintiff; (2) the defendants waived any defenses to coverage that they may have had because they failed to provide the plaintiff with timely notice of their denials of coverage; (3) National Union acted in violation of the common law and General Statutes § 38a-321[6]

"(ii) if the pollutants are brought on or to the site or location by or for you.

"(2) [to] any loss, cost or expense arising out of any governmental direction or request that you test for, monitor, clean up, remove, contain, treat, detoxify or neutralize pollutants.

"Pollutants means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste material. Waste material includes materials which are intended to be or have been recycled, reconditioned or reclaimed."

The court found that the exclusion in the National Union policy contained similar language.

The trial court further found that ISOP's policy also contained a provision titled "Contamination/Pollution Amendment." This provision provided: "It is understood and agreed that this policy does not cover any loss, damage or expense caused by contamination or pollution, whether or not brought about by a peril otherwise incurred. Contamination or pollution is defined as, loss, damages, or expense caused by gas(es), liquid(s), solid(s), or radioactive material which may be harmful to human health or the environment." Because we find that the plaintiff's claim is excluded by the absolute pollution exclusion in effect in its policies with the defendants, we need not discuss whether this amendment would also exclude coverage independently.

Although the plaintiff argues that the binders it received from National Union between 1989 and 1991, which refer to both a "pollution" clause and an "absolute pollution" clause, create an issue of fact as to what "version" of the exclusion actually controls this case, it is clear from the memorandum of decision that the trial court.found to be controlling the language within the original ten million dollar policy. This is the position advanced by the plaintiff in the memorandum filed in support of its original motion for summary judgment. See part II C of this opinion.

[6] General Statutes § 38a-321 provides: "(Formerly Sec. 38-175). LIABILITY OF INSURER UNDER LIABILITY POLICY. Each insurance company which issues a policy to any person, firm or corporation, insuring against loss or

in "wrongful[ly] attempt[ing] to alter and cancel the plaintiff's insurance policy after the plaintiff notified [National Union] of its claim"; (4) the defendants' conduct violated General Statutes §§ 38a-815 and 38a-816 (6) of the Connecticut Unfair Insurance Practices Act (CUIPA)[7] and General Statutes § 42-110a et seq. of the

damage on account of the bodily injury or death by accident of any person, or damage to the property of any person, for which loss or damage such person, firm or corporation is legally responsible, shall, whenever a loss occurs under such policy, become absolutely liable, and the payment of such loss shall not depend upon the satisfaction by the assured of a final judgment against him for loss, damage or death occasioned by such casualty. No such contract of insurance shall be cancelled or annulled by any agreement between the insurance company and the assured after the assured has become responsible for such loss or damage, and any such cancellation or annulment shall be void. Upon the recovery of a final judgment against any person, firm or corporation by any person, including administrators or executors, for loss or damage on account of bodily injury or death or damage to property, if the defendant in such action was insured against such loss or damage at the time when the right of action arose and if such judgment is not satisfied within thirty days after the date when it was rendered, such judgment creditor shall be subrogated to all the rights of the defendant and shall have a right of action against the insurer to the same extent that the defendant in such action could have enforced his claim against such insurer had such defendant paid such judgment."

[7] General Statutes § 38a-815 provides: "(Formerly Sec. 38-60). UNFAIR PRACTICE PROHIBITED. No person shall engage in this state in any trade practice which is defined in section 38a-816 as, or determined pursuant to sections 38a-817 and 38a-818 to be, an unfair method of competition or an unfair or deceptive act or practice in the business of insurance, nor shall any domestic insurance company engage outside of this state in any act or practice defined in subsections (1) to (12), inclusive, of section 38a-816. The commissioner shall have power to examine the affairs of every person engaged in the business of insurance in this state in order to determine whether such person has been or is engaged in any unfair method of competition or in any unfair or deceptive act or practice prohibited by sections 38a-815 to 38a-819, inclusive. When used in said sections, 'person' means any individual, corporation, association, partnership, reciprocal exchange, interinsurer, Lloyd's insurer, fraternal benefit society, and any other legal entity engaged in the business of insurance, including agents, brokers and adjusters."

General Statutes § 38a-816 provides in relevant part: "(Formerly Sec. 38-61). UNFAIR PRACTICES DEFINED. The following are defined as unfair

Connecticut Unfair Trade Practices Act (CUTPA);[8] (5)
the defendants' conduct violated CUIPA under Gen-

methods of competition and unfair and deceptive acts or practices in the
business of insurance:

\* \* \*

"(6) UNFAIR CLAIM SETTLEMENT PRACTICES. Committing or performing
with such frequency as to indicate a general business practice any of the
following: (a) Misrepresenting pertinent facts or insurance policy provisions
relating to coverages at issue; (b) failing to acknowledge and act with rea-
sonable promptness upon communications with respect to claims arising
under insurance policies; (c) failing to adopt and implement reasonable stan-
dards for the prompt investigation of claims arising under insurance poli-
cies; (d) refusing to pay claims without conducting a reasonable investigation
based upon all available information; (e) failing to affirm or deny coverage
of claims within a reasonable time after proof of loss statements have been
completed; (f) not attempting in good faith to effectuate prompt, fair and
equitable settlements of claims in which liability has become reasonably
clear; (g) compelling insureds to institute litigation to recover amounts due
under an insurance policy by offering substantially less than the amounts
ultimately recovered in actions brought by such insureds; (h) attempting
to settle a claim for less than the amount to which a reasonable man would
have believed he was entitled by reference to written or printed advertis-
ing material accompanying or made part of an application; (i) attempting
to settle claims on the basis of an application which was altered without
notice to, or knowledge or consent of the insured; (j) making claims pay-
ments to insureds or beneficiaries not accompanied by statements setting
forth the coverage under which the payments are being made; (k) making
known to insureds or claimants a policy of appealing from arbitration awards
in favor of insureds or claimants for the purpose of compelling them to accept
settlements or compromises less than the amount awarded in arbitration;
(l) delaying the investigation or payment of claims by requiring an insured,
claimant, or the physician of either to submit a preliminary claim report
and then requiring the subsequent submission of formal proof of loss forms,
both of which submissions contain substantially the same information;
(m) failing to promptly settle claims, where liability has become reasonably
clear, under one portion of the insurance policy coverage in order to influ-
ence settlements under other portions of the insurance policy coverage;
(n) failing to promptly provide a reasonable explanation of the basis in the
insurance policy in relation to the facts or applicable law for denial of a
claim or for the offer of a compromise settlement; (o) using as a basis for
cash settlement with a first party automobile insurance claimant an amount
which is less than the amount which the insurer would pay if repairs were
made unless such amount is agreed to by the insured or provided for by
the insurance policy."

[8] This apparently refers to the entirety of chapter 735a of the General
Statutes entitled "Unfair Trade Practices."

eral Statutes §§ 38a-815 and 38a-816 (1) and (2);[9] and (6) the defendants breached their duty of good faith and fair dealing. The defendants filed an answer to the complaint, along with thirty-five "affirmative defenses," on September 3, 1991. The plaintiff filed its reply to the defendants' affirmative defenses on November 13, 1991.

On September 30, 1991, the plaintiff moved the trial court to grant partial summary judgment and to declare that: (1) the defendants "are obligated under either or both of their insurance policies to pay on behalf of [the

---

[9] See footnote 7 for the text of General Statutes § 38a-815.

General Statutes § 38a-816 provides in relevant part: "(Formerly Sec. 38-61). UNFAIR PRACTICES DEFINED. The following are defined as unfair methods of competition and unfair and deceptive acts or practices in the business of insurance:

"(1) MISREPRESENTATIONS AND FALSE ADVERTISING OF INSURANCE POLICIES. Making, issuing or circulating, or causing to be made, issued or circulated, any estimate, illustration, circular or statement, sales presentation, omission or comparison which: (a) Misrepresents the benefits, advantages, conditions or terms of any insurance policy; (b) misrepresents the dividends or share of the surplus to be received, on any insurance policy; (c) makes any false or misleading statements as to the dividends or share of surplus previously paid on any insurance policy; (d) is misleading or is a misrepresentation as to the financial condition of any person, or as to the legal reserve system upon which any life insurer operates; (e) uses any name or title of any insurance policy or class of insurance policies misrepresenting the true nature thereof; (f) is a misrepresentation for the purpose of inducing or tending to induce to the lapse, forfeiture, exchange, conversion or surrender of any insurance policy; (g) is a misrepresentation for the purpose of effecting a pledge or assignment of or effecting a loan against any insurance policy; or (h) misrepresents any insurance policy as being shares of stock.

"(2) FALSE INFORMATION AND ADVERTISING GENERALLY. Making, publishing, disseminating, circulating or placing before the public, or causing, directly or indirectly, to be made, published, disseminated, circulated or placed before the public, in a newspaper, magazine or other publication, or in the form of a notice, circular, pamphlet, letter or poster, or over any radio or television station, or in any other way, an advertisement, announcement or statement containing any assertion, representation or statement with respect to the business of insurance or with respect to any person in the conduct of his insurance business, which is untrue, deceptive or misleading."

plaintiff] any expenses, by way of defense and/or liability, incurred by [the plaintiff] in connection with the fuel oil product spill from [its] property into Stamford Harbor; (2) . . . [the defendants] have waived any purported defenses to coverage as a result of their untimely denials of coverage; and (3) . . . National Union violated [CUIPA] and [CUTPA]." In response, on October 28, 1991, the defendants filed a motion for summary judgment requesting that the trial court declare that, in light of the policy exclusions, they had no duty to defend or to indemnify the plaintiff for costs arising from the fuel oil spill.

On January 7, 1992, the plaintiff served on the defendants a set of requests for the production of documents, seeking, inter alia, broad disclosure of all writings pertaining to the existence and extent of its own insurance coverage.[10] On February 6, 1992, the defendants countered the plaintiff's motion, moving that the trial court grant a protective order authorizing them to withhold disclosure of their responses to the plaintiff's requests for production of documents. In its memorandum of decision of February 25, 1993, the trial court granted the motion for summary judgment in favor of the defendants on the first,[11] second,[12] fourth

[10] This discovery request sought in excess of forty-seven different types of written documentation related to the defendants' policies and business relationship with the plaintiff as well as other policyholders. For example, the request sought writings related to the drafting history of various policies and exclusions, financial information concerned with coverages and claims under policies, other claims previously made against the defendants due to fuel oil spills, and other claims of unfair trade or insurance practices against the defendants.

[11] The trial court articulated that "there are no genuine issues of material fact concerning the defendants' absolute pollution exclusions, and judgment as a matter of law may be entered in favor of the defendants because: (1) the pollution exclusions are clear and unambiguous; (2) the pollution exclusions are absolute; and (3) oil leaking into waterways is defined as pollution by the pertinent federal and state statutes."

[12] The trial court explained: "Since the plaintiff's claim is barred by the defendants' pollution exclusion clauses, the plaintiff, as a matter of law,

and fifth[13] counts of the complaint.[14] Further, the trial court denied the plaintiff's request to compel discovery.

On March 12, 1993, the plaintiff filed a motion to open the judgment and/or to reargue the trial court's decision of February 25, 1993, claiming that: (1) newly received information from the commissioner of insurance revealed that the defendants had failed to file the exclusions properly, thereby invalidating the exclusions and requiring summary judgment in its favor as a matter of law; and (2) it had moved for summary judgment only on the first, second and third counts and that the trial court therefore acted improperly in rendering judgment on the first, second, fourth and fifth counts.

should not be allowed to use the remedies of waiver and estoppel to create coverage where none exists. Accordingly, there are no genuine issues of material fact . . . ."

[13] The trial court stated: "The undisputed facts stated in the plaintiff's supporting affidavits do not prove that [the] defendant National [Union] violated General Statutes § 38a-816 (6), as the plaintiff fails to prove that National [Union] made misrepresentations relating to the insurance coverage at issue or that National [Union] failed to take prompt action with respect to the plaintiff's claim. Since the plaintiff fails to prove that National [Union] violated § 38a-816 (6) 'with such frequency as to indicate a general business practice,' the plaintiff cannot prove that [National Union's] conduct amounts to a violation of CUTPA. . . . The undisputed facts stated in the plaintiff's supporting affidavits fail to prove that [the] defendant National [Union] violated General Statutes § 38a-816 (1), and (2) as the plaintiff fails to prove that National [Union] (1) misrepresented the true nature of its insurance policy; (2) made a misrepresentation for the purpose of inducing a lapse, forfeiture, exchange, conversion or surrender of the plaintiff's policy, or (3) engaged in some form of false advertising.

"Since the plaintiff has failed to prove that National [Union] violated CUIPA, the plaintiff failed to prove that National [Union] engaged in some unfair business practice or violation of public policy that would amount to a violation of CUTPA."

[14] Although the trial court expressly rendered summary judgment only on the first, second, fourth and fifth counts, it later rendered judgment, effective February 24, 1993, in favor of the defendants on the third and sixth counts. The trial court made the judgment nunc pro tunc effective February 24, 1993, rather than February 25, 1993, the date of the partial summary judgment. See footnote 15.

On May 17, 1993, the trial court denied the plaintiff's motion, concluding that: (1) the plaintiff had waived consideration of the filing issues by failing to raise them in its memoranda in support of its motion for partial summary judgment and in opposition to the defendants' motion for summary judgment; and (2) it properly had rendered summary judgment on those counts of the complaint that contained CUIPA and CUTPA causes of action. The plaintiff appealed to the Appellate Court,[15] and we thereafter transferred the case to this court pursuant to Practice Book § 4023 and General Statutes § 51-199 (c).

## I

The plaintiff first claims that the trial court improperly granted the motion for summary judgment in favor of the defendants on the first and second counts of the complaint, the counts related to the defendants' duty to defend and to indemnify it for claims arising from the fuel oil spill. More specifically, the plaintiff claims that the trial court erroneously granted the motion for summary judgment on the basis of its incorrect conclusion that the policy provisions excluded all coverage for its fuel oil spill into Stamford Harbor. In support of this claim, the plaintiff asserts two primary arguments: (1) that the trial court improperly interpreted the meaning of the insurance contracts and the exclusions; and (2) that the trial court wrongly found that the defendants did not waive their right to rely on the policy exclusions. We disagree.

---

[15] On November 3, 1993, the defendants filed with the trial court a motion for final judgment nunc pro tunc on the third and sixth counts of the plaintiff's complaint. In support of the motion, the defendants explained that the state referee at the preargument conference had questioned whether the trial court's decision of February 25, 1993, was a final judgment as to all six counts. The plaintiff did not oppose the defendants' motion, and on March 4, 1994, the trial court rendered judgment nunc pro tunc, with an effective date of February 24, 1993, on the third and sixth counts of the plaintiff's complaint. Thus, the trial court effectively rendered an appealable final judgment as of February 24, 1993.

## A

On the issue of the trial court's interpretation of the insurance contracts and the pollution exclusions, the plaintiff principally argues that the pollution exclusions do not exclude a fuel oil spill of any type. In the alternative, the plaintiff avers that even if the clauses may exclude fuel oil spills under certain circumstances, they do not exclude coverage for a spill of the particular nature involved in this case. Moreover, the plaintiff contends that, at a minimum, the exclusions are ambiguous and therefore should be interpreted against the defendants, requiring summary judgment in its favor. In opposition, the defendants argue that the pollution exclusions unambiguously exclude coverage for damages caused by the release of fuel oil into a waterway such as Stamford Harbor.[16] We agree with the defendants' interpretation of the exclusions and hold that coverage for the plaintiff's fuel oil spill into Stamford Harbor was excluded by the applicable exclusions. Therefore, we conclude that the trial court properly granted the motion for summary judgment in favor of the defendants on the first and second counts of the complaint.[17]

"Under our law, the terms of an insurance policy are to be construed according to the general rules of con-

---

[16] The defendants also suggest that written statements made by the plaintiff and the Coast Guard referring to the oil spill as "pollution" or "pollution incident" support or establish its coverage determination. We do not consider the merits of this position in our disposition of the case.

[17] Because we hold that the defendants owe no duty to indemnify the plaintiff for damages arising from the fuel oil spill, we also conclude that they owe no duty to defend the plaintiff from claims arising from those damages. See, e.g., *Alderman* v. *Hanover Ins. Group*, 169 Conn. 603, 610, 363 A.2d 1102 (1975) (duty to defend arises if policy covers particular claim). We acknowledge the plaintiff's citation to cases holding that an insurer's duty to defend is broader than its duty to indemnify, but we are unpersuaded that such authority is relevant when, as in this case, the exclusion clearly and unambiguously excludes coverage for fuel oil spilled into Stamford Harbor.

tract construction. See, e.g., *Weingarten* v. *Allstate Ins. Co.*, 169 Conn. 502, 509–10, 363 A.2d 1055 [(1975), overruled in part on other grounds, *Streitweiser* v. *Middlesex Mutual Assurance Co.*, 219 Conn. 371, 593 A.2d 498 (1991)]; *A. M. Larson Co.* v. *Lawlor Ins. Agency, Inc.*, 153 Conn. 618, 622, 220 A.2d 32 [1966]. The determinative question is the intent of the parties, that is, what coverage the . . . [plaintiff] expected to receive and what the defendant was to provide, as disclosed by the provisions of the policy. *Marcolini* v. *Allstate Ins. Co.*, 160 Conn. 280, 283, 278 A.2d 796 [1971]. If the terms of the policy are clear and unambiguous, then the language, from which the intention of the parties is to be deduced, must be accorded its natural and ordinary meaning. *Weingarten* v. *Allstate Ins. Co.*, supra, 509. However, [w]hen the words of an insurance contract are, without violence, susceptible of two [equally responsible] interpretations, that which will sustain the claim and cover the loss must, in preference, be adopted. *Raffel* v. *Travelers Indemnity Co.*, 141 Conn. 389, 392, 106 A.2d 716 [1954]; see also 4 [S.] Williston, Contracts (3d Ed. [1961]) § 621." (Internal quotation marks omitted.) *Griswold* v. *Union Labor Life Ins. Co.*, 186 Conn. 507, 512–13, 442 A.2d 920 (1982); see *Hammer* v. *Lumberman's Mutual Casualty Co.*, 214 Conn. 573, 583–84, 573 A.2d 699 (1990). "[T]his rule of construction favorable to the insured extends to exclusion clauses." *Griswold* v. *Union Labor Life Ins. Co.*, supra, 514; *Smedley Co.* v. *Employers Mutual Liability Ins. Co.*, 143 Conn. 510, 513, 123 A.2d 755 (1956).

Our jurisprudence makes clear, however, that "[a]lthough ambiguities are to be construed against the insurer, when the language is plain, no such construction is to be applied." *Izzo* v. *Colonial Penn Ins. Co.*, 203 Conn. 305, 309–10, 524 A.2d 641 (1987); *Gottesman* v. *Aetna Ins. Co.*, 177 Conn. 631, 634, 418 A.2d 944 (1979); *Smedley Co.* v. *Employers Mutual Liabil-*

*ity Ins. Co.,* supra, 143 Conn. 513. Indeed, "courts cannot indulge in a forced construction ignoring provisions or so distorting them as to accord a meaning other than that evidently intended by the parties." *Plainville* v. *Travelers Indemnity Co.,* 178 Conn. 664, 675, 425 A.2d 131 (1979); *Porto* v. *Metropolitan Life Ins. Co.,* 120 Conn. 196, 200, 180 A. 289 (1935); *Komroff* v. *Maryland Casualty Co.,* 105 Conn. 402, 405, 135 A. 388 (1926); see *Hammer* v. *Lumberman's Mutual Casualty Co.,* supra, 214 Conn. 584; *Horak* v. *Middlesex Mutual Assurance Co.,* 181 Conn. 614, 617, 436 A.2d 783 (1980); see also *Aschenbrenner* v. *United States Fidelity & Guaranty Co.,* 292 U.S. 80, 84, 54 S. Ct. 590, 78 L. Ed. 1137 (1934).

Accordingly, in order to determine whether the exclusions within the plaintiff's policies exclude the fuel oil spill into Stamford Harbor, we must determine whether the policies are clear and unambiguous on this point. More precisely, we must examine whether the language of each policy clause clearly and unambiguously defines "pollutant" to include fuel oil released into a waterway such as the Stamford Harbor. If we so determine, we must then accord that language its natural and ordinary meaning. In other words, if the clauses unambiguously define "pollutant" to include fuel oil spilled into a waterway such as Stamford Harbor, we may not "indulge in a forced construction"; *Plainville* v. *Travelers Indemnity Co.,* supra, 178 Conn. 675; distorting that plain meaning. This case presents a question of first impression regarding the meaning of "pollutant" as expressed within the context of this exclusion.

The trial court found that the exclusion in ISOP's policy, also known as an "absolute pollution" exclusion due to the breadth and depth of its exclusionary language, excludes coverage for, inter alia, " 'bodily injury' or 'property damage' arising out of the alleged or threatened discharge, dispersal, release or escape

of pollutants . . . ." Further, it found that the clause excludes coverage for "any loss, cost or expense arising out of any governmental direction or request that you test for, monitor, clean up, remove, contain, treat, detoxify or neutralize pollutants." The exclusion clause also specifies that "[p]ollutants means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste material. Waste material includes materials which are intended to be or have been recycled, reconditioned or reclaimed." The trial court found that the exclusion contained in National Union's policy embodies similar exclusionary language.

The plain language of the absolute pollution exclusion clause therefore makes clear that a liquid is an excluded "pollutant" if it may be characterized as an "irritant" or "contaminant." The dictionary defines "contaminant" as "something that contaminates," and it defines "contaminate" as "to soil, stain, corrupt, or infect by contact or association" or "to render unfit for use by the introduction of unwholesome or undesirable elements." Webster's Third New International Dictionary (1986). Similarly, the dictionary defines "pollutant" as "something that pollutes . . . a polluting substance, medium, or agent," and it defines "pollute" as "to . . . impair the purity of . . . to make physically impure or unclean." Id.

There is no question that the introduction of fuel oil into a waterway such as Stamford Harbor "soils," "corrupts," "infects," and/or "renders unfit for use" the affected water. Fuel oil does not naturally occur in the waters of Stamford Harbor. Moreover, it cannot seriously be disputed that the introduction of fuel oil served to "impair the purity of" the water in the harbor. Indeed, the Coast Guard's swift and intensive investigation of the spill, followed by the plaintiff's substantial remediation efforts, illustrates that the presence

of fuel oil in the harbor represents a substantial hazard to the quality of the water and to the wildlife in the area. Thus, an ordinary, lay definition of "pollutant" includes fuel oil spilled into a waterway such as Stamford Harbor.

Additionally, statutory definitions of "pollutant" or "pollution" indicate that "pollutant" within an absolute pollution exclusion includes fuel oil spilled into a waterway. General Statutes § 22a-451 (a) provides in relevant part: "Any person, firm or corporation which directly or indirectly causes *pollution* and contamination of any land or waters of the state or causes an emergency through the discharge, spillage, uncontrolled loss, seepage or filtration of *oil or petroleum* . . . deemed by the commissioner to be a potential threat to human health or the environment and removed by the commissioner shall be liable for all costs and expenses . . . ." (Emphasis added.) General Statutes § 22a-448 (4) defines "oil or petroleum" for the purposes of § 22a-451 (a) as "oil or petroleum of any kind or in any form including but not limited to . . . fuel oil . . . ." Thus, we find that the plain meaning of the exclusions demonstrates the intention of the parties to exclude from coverage as a "pollutant" oil spilled into Stamford Harbor.[18]

---

[18] We reject the plaintiff's argument that we should look to the existence in the insurance industry of oil-specific exclusions as evidence that the absolute pollution exclusion does not include oil as a "pollutant." This argument incorrectly assumes that because an insurer may offer to sell to a customer a policy with a narrowly tailored exclusion pertaining only to specific causes of damage such as oil, that same insurer cannot also offer to that customer, for a lower premium, a policy with a more broad exclusion that excludes coverage for damage caused by all types of pollution, including oil.

We similarly reject the plaintiff's argument that because some environmental statutes expressly exclude oil products from their definitions of "pollutant"; see, e.g., Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9601 (14) (1986) (excluding oil from definition of "hazardous substances"); fuel oil spilled into Stamford Harbor is

Moreover, we find persuasive those authorities recognizing that a petroleum product, when released into a waterway, clearly constitutes a "pollutant" within the meaning of the absolute pollution exclusion. *Union Mutual Fire Ins. Co.* v. *Hatch*, 835 F. Sup. 59, 64–66 (D.N.H. 1993) (under New Hampshire law, gasoline that leaked into soil and ground water is "pollutant" within meaning of absolute pollution exclusion); *Guilford Industries Inc.* v. *Liberty Mutual Ins. Co.*, 688 F. Sup. 792, 793 (D. Me. 1988) (under Maine law, fuel oil that spilled into river is "pollutant" within meaning of absolute pollution exclusion), aff'd, 879 F.2d 853 (1st Cir. 1989); see *United States* v. *Standard Oil Co.*, 384 U.S. 224, 226, 86 S. Ct. 1427, 16 L. Ed. 2d 492 (1966) ("[the] presence [of gasoline] in our rivers and harbors is both a menace to navigation and a pollutant"); see also *American States Ins. Co.* v. *F.H.S., Inc.*, 843 F. Sup. 187, 189–90 (S.D. Miss. 1994) (absolute pollution exclusion unambiguously excludes coverage for harm caused by accidental release of ammonia into atmosphere).

Despite this clear and unambiguous meaning of "pollutant," the plaintiff argues that we must look beyond the plain language to uncover an intended, yet unexpressed, limitation on the scope of the definition of "pollutant." The plaintiff contends that because some courts have interpreted the absolute pollution exclusion as not excluding coverage in certain instances, we should not rely on the exclusions here without a clear expression of the parties' intent to include a fuel oil spill within the meaning of "pollutant." Each of these cases is distinguishable and none answers whether oil

not a pollutant within the meaning of the absolute pollution exclusion. If an environmental statute's express limitation of "pollutant" not to include oil bears any relevance to our inquiry, it seems to undermine rather than bolster the plaintiff's position because a legislature likely would have no need to exclude oil from the definition of "pollutant" unless it believed that oil was within the ordinary meaning of that term originally.

in a waterway is a pollutant.[19] Further, the plaintiff's citation of cases finding an "ambiguity" in the absolute pollution exclusion, either on its face or as applied, fails to convince us that the clause is ambiguous as applied to the particular facts of this case.[20]

[19] The plaintiff cites *W.H. Breshears, Inc.* v. *Federated Mutual Ins. Co.*, Docket No. CV-F-91-6 REC (E.D. Cal. July 31, 1991), *West* v. *Board of Commissioners*, 591 So. 2d 1358 (La. App. 1991), and *Atlantic Mutual Ins. Co.* v. *McFadden*, 413 Mass. 90, 595 N.E.2d 762 (1992), for the proposition that "the pollutants exclusions are limited exclusions and courts do not automatically apply them to exclude liability without a clear expression of intent." In *W.H. Breshears, Inc.* v. *Federated Mutual Ins. Co.*, supra, 17, although the court refused to hold, as a matter of law, that unleaded gasoline was a "pollutant" within the meaning of a pollution exclusion, the court concluded that the gasoline had affected soil, not water. The court specified that "the provided authority does not support a finding that, as a matter of law, unleaded gasoline is a pollutant within the meaning of the policies at issue. The federal environmental law, both statutory and decisional, address Congress' and the California legislature's specific concerns regarding emission of oil into navigable and non-navigable waterways. The cases cited by Federated [the insurer] specifically rely on the compelling grounds for protecting the quality of the nation's waterways, including commercial trade, public health, and other environmental and even aesthetic reasons. In addition, both the federal and state statutory law address concerns of damage to waterways. In the instant case, there has been no damage to any waterway." Id.

Similarly, in *McFadden*, the court upheld the trial court's rendering of summary judgment against the insurer on the issue of the applicability of the absolute pollution exclusion to a claim arising from the lead poisoning of children, concluding that "an insured could reasonably have understood the provision at issue [an absolute pollution exclusion] to exclude coverage for injury caused by certain forms of industrial pollution, but not coverage for injury allegedly caused by the presence of leaded materials in a private residence." *Atlantic Mutual Ins. Co.* v. *McFadden*, supra, 413 Mass. 92. Thus, *McFadden*, like *W.H. Breshears, Inc.*, provides no contrary authority to the proposition that oil spilled in a waterway is a pollutant.

Finally, in *West*, the court reversed the decision of the trial court rendering summary judgment in favor of the insurer on the issue of the application of a pollution exclusion to a claim arising from a worker's inhalation of Azinphosmenthyl fumes. *West* v. *Board of Commissioners*, supra, 591 So. 2d 1361. Although that court determined that "the exclusion is applicable to 'polluters'—those who indifferently pollute our environment—and not to those who only incidentally possess the pollutant in the course of their other business," it construed an exclusion with language different than that at issue in this case. Id., 1360.

[20] See *Westchester Fire Ins. Co.* v. *Pittsburg*, 794 F. Sup. 353 (D. Kan.

We conclude, therefore, that the clear and unambiguous language of the absolute pollution exclusions excludes coverage for the plaintiff's spill of fuel oil into Stamford Harbor. Accordingly, we may not look to evidence outside the insurance contracts to vary or distort that plain meaning. See *Leathermode Sportswear, Inc.* v. *Liberty Mutual Ins. Co.*, 150 Conn. 63, 66, 186 A.2d 79 (1962) ("[t]he effect of the [insurance] contract must be determined by the intent expressed in it and not by an extraneous intent which may be claimed or believed to have been in the minds of the parties"); see

1992), aff'd sub nom. *Pennsylvania National Mutual Casualty Ins. Co.* v. *Pittsburg*, 987 F.2d 1516 (10th Cir. 1993); *West American Ins. Co.* v. *Tufco Flooring*, 104 N.C. App. 312, 409 S.E.2d 692 (1991), review dismissed, 332 N.C. 479, 420 S.E.2d 826 (1992). In *Westchester Fire Ins. Co.* v. *Pittsburg*, supra, 354, the court denied the parties' motions for summary judgment on the issue of whether the absolute pollution exclusions in two of the city's insurance policies excluded coverage for "injuries allegedly sustained when the City sprayed [the plaintiffs in an underlying state action against the city] with an insecticide called malathion." Criticizing that under the clauses' broad definition of "pollutants" "[a]ny substance could conceivably be an 'irritant or contaminant' under the right circumstances," the court stated that "[l]ack of precision in the definition of 'pollutants' renders the entire exclusion ambiguous." Id., 355. The plaintiff claims that this rationale applies equally to this case and that we therefore must construe that ambiguity against the defendants in favor of coverage. We reject that overbroad conclusion because it fails to recognize that many substances, including fuel oil, otherwise considered to be useful or beneficial, necessarily become "contaminants" when released into the environment.

The *West American Ins. Co.* decision does not support the plaintiff's claim of ambiguity. In that case, the court interpreted an absolute pollution exclusion identical to that in this case and found that the policy was ambiguous as applied to claims arising from property damage caused by styrene vapors. *West American Ins. Co.* v. *Tufco Flooring*, supra, 104 N.C. App. 320–21. In holding only that the policy was ambiguous as applied to the facts, the *West American Ins. Co.* court found that the styrene vapor damage occurred in the course of the insured's "regular business activities" and reasoned that "[t]o allow [the insurer] to deny coverage for claims arising out of [the insured's] central business activity would render the policy virtually useless to [the insured]." Id., 321. That rationale does not apply here because it is clear that fuel oil storage was not the plaintiff's central business activity and that protection from a fuel oil spill was therefore not the primary purpose of the plaintiff's policies with the defendants.

also *Hammer* v. *Lumberman's Mutual Casualty Co.*, supra, 214 Conn. 584.

B

The plaintiff also argues that the trial court incorrectly determined that the defendants did not waive their right to rely on the policy exclusions. Specifically, the plaintiff argues that the lapse in time between the filing of its claims with the defendants and the subsequent denials of coverage amounted, as a matter of law, to a waiver of their policy defenses. We disagree.

Waiver is the intentional relinquishment of a known right. *Wadia Enterprises, Inc.* v. *Hirschfeld*, 224 Conn. 240, 251, 618 A.2d 506 (1992); *Olean* v. *Treglia*, 190 Conn. 756, 772, 463 A.2d 242 (1983); *Multiplastics, Inc.* v. *Arch Industries, Inc.*, 166 Conn. 280, 286, 348 A.2d 618 (1974); *Brauer* v. *Freccia*, 159 Conn. 289, 295, 268 A.2d 645 (1970). A waiver occurs, therefore, only if there is both knowledge of the existence of the right and intent to relinquish it. *Novella* v. *Hartford Accident & Indemnity Co.*, 163 Conn. 552, 562, 316 A.2d 394 (1972); see 16B J. & J. Appleman, Insurance Law and Practice (1981) § 9081, p. 491.

In the insurance context, moreover, it has been recognized that "a contract, under the guise of waiver, [may not] be reformed to create a liability for a condition specifically excluded by the specific terms of the policy." 16B J. & J. Appleman, supra, § 9090, pp. 584–85. This limitation on the applicability of waiver to an insurance contract recognizes that because waiver requires the relinquishment of a known, and therefore existing, right within the insurance contract, a party cannot create through waiver coverage for a claim that the parties expressly had excluded from that contract. See id., p. 588.

Nonetheless, the plaintiff argues that we should follow the precedent of those courts recognizing, in the

plaintiff's view, that an insurer may waive its right to assert an exclusion under certain circumstances. See, e.g., *Val Drugs, Inc.* v. *Lynn*, 402 F. Sup. 174 (W.D.N.Y. 1975); *Hartford Ins. Co.* v. *Nassau*, 46 N.Y.2d 1028, 389 N.E.2d 1061, 416 N.Y.S.2d 539 (1979). These cases are distinguishable from the present case, however, because they are based not on the requirements of waiver, but on either equitable principles of estoppel;[21] see, e.g., *Val Drugs, Inc.* v. *Lynn*, supra, 177; or a court's interpretation of a specific statute regulating disclaimers of coverage. *Hartford Ins. Co.* v. *Nassau*, supra, 1029 (citing New York insurance statute governing timeliness of disclaimers). Because the plaintiff failed to establish the elements of estoppel at trial, it has no basis to argue estoppel on appeal and these cases are inapposite. Consequently, we find that the trial court properly rejected the plaintiff's waiver claim.

## II

The plaintiff next claims that the trial court improperly denied it the opportunity to conduct discovery to oppose the defendants' motion for summary judgment. In support of its claim, it argues that its motion for partial summary judgment "is based on the premise that the exclusions at issue are limited and do not apply to fuel oil, *or* that the exclusions are ambiguous and are inapplicable as a matter of law. If this Court is not persuaded by these arguments, however, [the plaintiff] is entitled to conduct discovery to prove that the exclusions are limited and do not apply to the facts of this

---

[21] "The essential elements of estoppel are that the party against whom estoppel is claimed must do or say something calculated or intended to induce another party to believe that certain facts exist and to act on that belief; and the other party must change its position in reliance on those facts, thereby incurring some injury. . . . (Citations omitted.) *O'Sullivan* v. *Bergenty*, 214 Conn. 641, 648, 573 A.2d 729 (1990)." (Internal quotation marks omitted.) *Hanover Ins. Co.* v. *Fireman's Fund Ins. Co.*, 217 Conn. 340, 351, 586 A.2d 567 (1991).

case." (Emphasis added.) Further, the plaintiff contends that it may move for summary judgment on its interpretation of the policies, yet seek discovery to defend against the defendants' motion for summary judgment on the very same issue. The plaintiff specifies that it is entitled to discovery for the following reasons: (1) to prove a latent ambiguity in the absolute pollution exclusion; (2) to show the intent of the drafters of the absolute pollution exclusion; (3) to ascertain the existence of the defendants' filings with state insurance regulators or any representations made by the defendants in marketing the policies; and (4) to determine the actual terms of its policy with National Union. Although we agree in principle that a plaintiff can move for summary judgment on some claims and still receive discovery as to the remaining ones; see, e.g., *American Fidelity & Casualty Co.* v. *London & Edinburgh Ins. Co.*, 354 F.2d 214, 216 (4th Cir. 1965); we find that the trial court properly denied the plaintiff further discovery in this case.

## A

Our analysis and holding in part I of this opinion necessarily dictates our rejection of the plaintiff's first and second discovery arguments. As we discussed therein, there is no ambiguity in the absolute pollution exclusions as applied to the facts of this case. Instead, we find that the clear and unambiguous language of the absolute pollution exclusions in the plaintiff's policies with the defendants excludes coverage for the fuel oil spill into Stamford Harbor. Discovery as to these materials is therefore inappropriate here because any evidence possibly derived from them would be inadmissible under the parol evidence rule.

"As we have so often noted, the parol evidence rule is not a rule of evidence, but a substantive rule of contract law. *Security Equities* v. *Giamba*, 210 Conn. 71,

77–78, 553 A.2d 1135 (1989); *Damora* v. *Christ-Janer*, 184 Conn. 109, 113, 441 A.2d 61 (1981); *Cohn* v. *Dunn*, 111 Conn. 342, 346, 149 A. 851 (1930); see also 2 Restatement (Second), Contracts § 213, comment (a) [1981]; 3 A. Corbin, [Contracts (1960)] § 573; 4 S. Williston, [Contracts (3d Ed. 1961)] § 631. The rule is premised upon the idea that 'when the parties have deliberately put their engagements into writing, in such terms as import a legal obligation, without any uncertainty as to the object or extent of such engagement, it is conclusively presumed, that the whole engagement of the parties, and the extent and manner of their understanding, was reduced to writing. After this, to permit oral testimony, or prior or contemporaneous conversations, or circumstances, or usages [etc.], in order to learn what was intended, or to contradict what is written, would be dangerous and unjust in the extreme.' *Glendale Woolen Co.* v. *The Protection Ins. Co.*, 21 Conn. 19, 37 (1851).

"The parol evidence rule does not of itself, therefore, forbid the presentation of 'parol evidence,' that is, evidence outside the four corners of the contract concerning matters governed by an integrated contract, but forbids only the use of such evidence to vary or contradict the terms of such a contract. Parol evidence offered solely to vary or contradict the written terms of an integrated contract is, therefore, legally irrelevant. When offered for that purpose, it is inadmissible not because it is parol evidence, but because it is irrelevant. By implication, such evidence may still be admissible if relevant '(1) to explain an ambiguity appearing in the instrument; (2) to prove a collateral oral agreement which does not vary the terms of the writing; (3) to add a missing term in a writing which indicates on its face that it does not set forth the complete agreement; or (4) to show mistake or fraud.' *Jay Realty, Inc.* v. *Ahearn Development Corporation*, 189 Conn. 52, 56,

453 A.2d 771 (1983). These recognized 'exceptions' are, of course, only examples of situations where the evidence (1) does not vary or contradict the contract's terms, or (2) may be considered because the contract has been shown not to be integrated; or (3) tends to show that the contract should be defeated or altered on the equitable ground that 'relief can be had against any deed or contract in writing founded in mistake or fraud.' *Noble* v. *Comstock*, 3 Conn. 295, 299 (1820); see also *Dale* v. *Gear*, 38 Conn. 15, 18–19 (1871) (agency, trust, equitable relation or equity may be shown by parol evidence)." *TIE Communications, Inc.* v. *Kopp*, 218 Conn. 281, 288–89, 589 A.2d 329 (1991).

Because we hold that the absolute pollution exclusions are unambiguous as applied to the facts of this case, the parol evidence rule bars the introduction of any extrinsic evidence to vary or contradict the plain meaning of the term "pollutant" as it is used in those exclusions. Because we determine that the plain meaning of "pollutant" includes fuel oil that has been spilled into a waterway such as Stamford Harbor, we may not look to extrinsic evidence of the exclusion's drafting history to find a contrary meaning.[22] Such evidence is "irrelevant" to the case. Thus, because a party is entitled to discovery only as to information material to the case or likely to lead to admissible evidence; Prac-

---

[22] The plaintiff contends that the parol evidence rule does not apply to this case because it seeks to introduce extrinsic evidence to aid in the interpretation of the language rather than to vary or contradict the plain language of the exclusions. Although we agree with the plaintiff's general statement that the parol evidence rule does not bar the use of extrinsic evidence to aid in the interpretation of contractual language; see, e.g., *Bead Chain Mfg. Co.* v. *Saxton Products, Inc.*, 183 Conn. 266, 272–73, 439 A.2d 314 (1981); we disagree that this principle applies to the facts of this particular case. Because we find that the exclusions clearly and unambiguously exclude coverage for fuel oil spills into a waterway such as Stamford Harbor, any extrinsic evidence purporting to establish that the exclusions do not exclude coverage for the spill would necessarily serve to contradict or vary the exclusions, rather than provide mere interpretive gloss.

tice Book § 218; the trial court properly denied the plaintiff's discovery request as to these materials.[23]

The plaintiff also argues that the trial court wrongly denied its request for discovery to prove a "latent ambiguity" in the absolute pollution exclusions. The plaintiff suggests that it is entitled "to make a reasonable attempt to discover evidence on the issue of applying the contract to the subject matter with which it deals, and thereby raise a fact issue on latent ambiguity." See *CBI Industries* v. *National Union Fire Ins. Co.*, 860 S.W.2d 662, 665–66 (Tex. App. 1993), writ granted, 37 Tex. Sup. Ct. J. 670 (1994). Because we find that the plaintiff has failed to proffer any evidence suggesting the existence of a latent ambiguity, we conclude that the trial court correctly denied the plaintiff's request for discovery on this issue.

The concept of "latent ambiguity" has been described as follows: "A latent ambiguity arises from extraneous or collateral facts which make the meaning of a written instrument uncertain although the language thereof be clear and unambiguous. The usual instance of a latent ambiguity is one in which a writing refers to a particular person or thing and is thus apparently clear on its face, but upon application to external objects is found to fit two or more of them equally." 4 S. Williston, supra, § 627, p. 898. In Connecticut, the vast majority of cases considering a claim of latent ambiguity have arisen in three limited contexts: (1) interpretation of statutes; see, e.g., *Rose* v. *Freedom of Information Commission*, 221 Conn. 217, 226–27, 602 A.2d 1019 (1992); *Elections Review Committee of the Eighth Utilities District* v. *Freedom of Information Commission*, 219 Conn. 685, 693–94, 595 A.2d 313 (1991); (2) interpretation of wills or trusts; see, e.g.,

---

[23] Under the same rationale, the plaintiff also is not entitled to discovery of representations made by the defendants in marketing the exclusions at issue.

*Connecticut National Bank & Trust Co.* v. *Chadwick,* 217 Conn. 260, 269–73, 585 A.2d 1189 (1991); *Beardsley* v. *Merry,* 136 Conn. 573, 576–77, 72 A.2d 829 (1950); and (3) interpretation of deeds to real property. See, e.g., *Apostles of the Sacred Heart* v. *Curott,* 187 Conn. 591, 598, 448 A.2d 157 (1982); *Young Men's Christian Assn.* v. *Zemel Bros., Inc.,* 171 Conn. 310, 311–12, 370 A.2d 937 (1976).

In fact, the plaintiff can offer no Connecticut precedent to support its reliance on latent ambiguity. Instead, it contends that this court should follow the approach adopted by an intermediate appellate court in Texas. See *CBI Industries* v. *National Union Fire Ins. Co.,* supra, 860 S.W.2d 665–66. In *CBI Industries,* the plaintiff, a contractor at an oil refinery, brought suit against its various insurers seeking a declaration of coverage for claims arising from its accidental release of hydrofluoric acid into the atmosphere. Id., 664. The insurers subsequently brought a motion for summary judgment based on the absolute pollution exclusions in their insurance policies with the plaintiff. In response, the plaintiff claimed that the terms "pollution," "pollutants," and "to pollute," were ambiguous, and that discovery was required in order to show the ambiguities and permit an accurate construction of the exclusions. Id. Thereafter, the trial court granted the motion in favor of the insurers after the plaintiff had time only to procure affidavits from its own personnel and some unauthenticated documents of testimony presented to the state insurance agency. Id.

On appeal, the Court of Appeals of Texas reversed the trial court's grant of the motion for summary judgment. Id., 665–67. In doing so, the court held that the plaintiff was entitled to a reasonable period of time to attempt to locate evidence of a "latent ambiguity." Id., 665. Further, the court listed four pieces of summary judgment evidence, including testimony before the

state insurance agency, filings made to the state and communications between third parties, to support its conclusion that the plaintiff had raised an issue of "latent ambiguity." Id., 666.

We decline to follow the rationale of the *CBI Industries* decision. Although the opinion couches its result in terms of "latent ambiguity," its reference to extrinsic pieces of evidence such as drafting history and third party communications suggests that the court uses the phrase "latent ambiguity" actually to mean nothing more than "varying the plain and unambiguous language of the exclusion with extrinsic evidence of intent." In essence, this decision has little to do with external facts creating an ambiguity in otherwise clear and unambiguous language, the traditional view of latent ambiguity, but seems to require a court, regardless of the clarity of the language utilized and the absence of irreconcilable external facts, always to consider extrinsic evidence of the parties' intent. Taken to its logical conclusion, this rule likely would prohibit a motion for summary judgment on any contract claim as long as a litigant proffers some extrinsic evidence of the parties' unexpressed intent. Consequently, we find that the trial court properly denied the plaintiff discovery on this issue.

B

The plaintiff also argues that the trial court improperly denied it the opportunity to obtain discovery regarding whether the defendants had filed the exclusions with state insurance regulators and received approval for the use of those exclusions. The plaintiff contends that such discovery would show that the defendants failed to file the exclusions or to obtain approval before using them in their policies. It asserts that if the defendants had failed to file the exclusions and to receive prior approval, the exclusions are invalid

and it would be entitled to summary judgment in its favor on the issues of the defendants' duties to defend and to indemnify.

In its memorandum of decision on the plaintiff's motion to open the judgment and/or to reargue, the trial court found, however, that the plaintiff had waived its right to assert the defendants' alleged failure to file and receive approval for the exclusions. The trial court noted that the plaintiff, by moving for summary judgment on its claims based on the insurance contracts, necessarily represented that there existed no genuine issue of material fact on the issue of contractual interpretation and that the trial court could therefore rule on those claims as a matter of law.

Refusing to permit discovery on this filing issue, the trial court recognized that the plaintiff had failed to raise that particular legal argument in any of its memoranda in support of its motion for partial summary judgment or in opposition to the defendants' motion for summary judgment. Further, the trial court determined that the plaintiff had discussed the filing and approval requirements of General Statutes § 38a-676[24] for the first time in its motion to reargue, dated March 12, 1993. The trial court also emphasized that the plaintiff, before moving for partial summary judgment, should have sought and could have received full discov-

---

[24] General Statutes § 38a-676 provides in relevant part: "(c) The form of any insurance policy or contract the rates for which are subject to the provisions of sections 38a-663 to 38a-697, inclusive, other than fidelity, surety or guaranty bonds, and the form of any endorsement modifying such insurance policy or contract, shall be filed with the insurance commissioner prior to its issuance. The commissioner shall adopt regulations in accordance with the provisions of chapter 54 establishing a procedure for review of such policy or contract. If at any time the commissioner finds that any such policy, contract or endorsement is not in accordance with such provisions or any other provision of law, he shall issue an order disapproving the issuance of such form and stating his reasons therefor. The provisions of section 38a-19 shall apply to any such order issued by the commissioner."

ery as to whether the defendants had filed the exclusions properly. We find that the trial court did not abuse its discretion in denying the plaintiff's motion to open the judgment and/or to reargue and therefore conclude that it properly denied the plaintiff the opportunity to seek discovery on this issue.

"The principles that govern motions to open or set aside a civil judgment are well established. Within four months of the date of the original judgment, Practice Book § 326 vests discretion in the trial court to determine whether there is a good and compelling reason for its modification or vacation. . . . *Gillis* v. *Gillis*, 214 Conn. 336, 340–41, 572 A.2d 323 (1990); *Sanchez* v. *Warden*, 214 Conn. 23, 35, 570 A.2d 673 (1990); *Acheson* v. *White*, 195 Conn. 211, 214–15, 487 A.2d 197 (1985); *Steve Viglione Sheet Metal Co.* v. *Sakonchick*, 190 Conn. 707, 713, 462 A.2d 1037 (1983). *Hirtle* v. *Hirtle*, 217 Conn. 394, 398, 586 A.2d 578 (1991). In determining whether the trial court abused its discretion, this court must make every reasonable presumption in favor of its action. *State* v. *Bitting*, 162 Conn. 1, 11, 291 A.2d 240 (1971); *E.M. Loew's Enterprises, Inc.* v. *Surabian*, 146 Conn. 608, 612, 153 A.2d 463 (1959). . . . *Walton* v. *New Hartford*, 223 Conn. 155, 169, 612 A.2d 1153 (1992)." (Internal quotation marks omitted.) *Somers* v. *Le Vasseur*, 230 Conn. 560, 570–71, 645 A.2d 993 (1994).

Similarly, the trial court may, in its discretion, permit reargument on the judgment, and we may disturb its decision only if it is an abuse of that discretion. See *Ideal Financing Assn.* v. *LaBonte*, 120 Conn. 190, 195–96, 180 A. 300 (1935). We must find such abuse of discretion if the trial court's decision results in "a miscarriage of justice." Id., 196.

We cannot find that the trial court abused its discretion in denying the plaintiff's motion to open the judg-

ment and/or to reargue. Although the plaintiff now argues that it had no meaningful opportunity to seek discovery from the commissioner of insurance and that the trial court's protective order precluded it from obtaining any information related to the filings from the defendants, it is noteworthy that the plaintiff, not the defendants, moved for summary judgment on the contract claims. Indeed, the defendants moved for and received a protective order permitting them to withhold discovery related to the insurance contracts only after the plaintiff filed its motion for partial summary judgment. We cannot find fault in the trial court's rejection of the plaintiff's pleas of insufficient time when the plaintiff's own actions had accelerated the very process of which it complained.

Further, although the plaintiff claims that it clearly had raised this precise filing issue in its motion for partial summary judgment and supporting memoranda, our reading of the record shows that the plaintiff had sought discovery on the defendants' filings with the commissioner of insurance only to show the defendants' intent regarding the exclusionary language and to raise an issue of material fact about the actual contents of the exclusions. For example, the plaintiff cited in its memorandum in support of its motion for partial summary judgment *Gerrish Corp.* v. *Universal Underwriters Ins. Co.*, 947 F.2d 1023 (2d Cir. 1991), cert. denied, 504 U.S. 973, 112 S. Ct. 2939, 119 L. Ed. 2d 564 (1992), which concluded that a filing with the state by an insurance rating organization bound that organization's member-insurer to the terms of its policy as amended by the filing. Because this case and the plaintiff's other references do not discuss the consequences of an insurer's failure to file an exclusion and therefore certainly did not go so far as to raise a claim that such a failure to file renders an exclusion void, we cannot hold that the trial court abused its discretion

in not granting the motion to open the judgment and/or to reargue based on the force of these vague references. Our conclusion on this point is further buttressed by our determination that the exclusions are clear and unambiguous as applied to the facts of this case.[25]

## C

The plaintiff also claims that the trial court improperly denied it access to discovery on the issue of what pollutants exclusion, if any, can be considered part of its National Union policy. In support of this claim, the plaintiff argues that because one binder issued by National Union refers to "Pollution" and another binder refers to "Absolute Pollution," there remains an issue of fact as to which version of the pollution exclusion was supposed to be in its policy. The plaintiff emphasizes that its inability to obtain a copy of the policy or policies reflected in the binders heightens its need for discovery to ascertain the exact policy language. We reject this argument as directly contrary to the plaintiff's own admissions and the findings of the trial court.

In moving for partial summary judgment, the plaintiff expressly stated to the court that "there are no facts in dispute which would prevent this Court from ruling on either [the plaintiff's] insurance coverage or CUTPA and CUIPA claims. Therefore, summary judgment is appropriate under Connecticut law." In doing so, the

[25] We also note that the plaintiff neither alleged nor offered any evidence to show unconscionability or fraud in the exclusions, which might have required the trial court to exercise its discretion. See *Holly Hill Holdings* v. *Lowman*, 226 Conn. 748, 756, 628 A.2d 1298 (1993). "[I]n private disputes, a court must enforce the contract as drafted by the parties and may not relieve a contracting party from anticipated or actual difficulties undertaken pursuant to the contract, unless the contract is voidable on grounds such as mistake, fraud or unconscionability. See 1 Restatement (Second), Contracts §§ 154, 159, and vol. 2, § 208 (1981); cf. *Warner* v. *Pandolfo*, 143 Conn. 728, 122 A.2d 738 (1956)." Id.

plaintiff acknowledged, in effect, that the trial court could treat its insurance coverage claim as a matter of law. See Practice Book § 384. Indeed, the plaintiff stated in its memorandum accompanying the motion that "[a]s explained below, this policy [the original ten million dollar policy with National Union containing the exclusion in question] was extended to cover the period at issue in this case." Despite these clear statements to the trial court, the plaintiff later responded to the defendants' motion for summary judgment by claiming that the actual language of its policy with National Union remained an issue of material fact.

On the basis of the prior admissions of the plaintiff, the trial court permissibly disregarded the plaintiff's subsequent protest that there existed an issue of fact relating to its National Union policy. See C. Tait & J. LaPlante, Connecticut Evidence (2d Ed. 1988) § 6.7.1 (discussing conclusive effect of judicial admissions). The trial court appropriately considered the affidavits and other proof in making its factual determination concerning the contents of the relevant insurance policies. As to the plaintiff's policy with National Union, the trial court found that it contained an exclusion equivalent to that in the ISOP policy. Because the plaintiff submitted ample evidence with its motion for partial summary judgment to support this determination, we conclude that the trial court's finding was not clearly erroneous. See Practice Book § 4061; *Doyle* v. *Kulesza*, 197 Conn. 101, 105, 495 A.2d 1074 (1985). Consequently, the trial court properly denied the plaintiff's request for further discovery on that issue.

### III

Finally, the plaintiff claims that the trial court improperly rendered summary judgment in favor of the defendants on the third, fourth and fifth counts of the complaint. The plaintiff contends that the third count

of the complaint alleged a violation of General Statutes § 38a-816, specifically § 38a-816 (1) (f), and that the trial court mistakenly granted the motion for summary judgment against it on that count applying an analysis inappropriate to a claim under that statutory subsection. Further, the plaintiff asserts that the trial court erred in granting the motion for summary judgment on the fourth and fifth counts of the complaint because neither the defendants nor the plaintiff had moved for summary judgment on those counts. We reject these claims.

We have previously recognized that CUTPA and CUIPA claims both "ordinarily involve different factual inquiries" and that "the duties ordinarily associated with them derive from different sources" than claims that rely instead on an underlying insurance contract. *Lees* v. *Middlesex Ins. Co.*, 219 Conn. 644, 653, 594 A.2d 952 (1991). In a CUTPA or CUIPA claim, "the insurer's liability is ordinarily based on its conduct in settling or failing to settle the insured's claim and on its claims settlement policies in general. The factual inquiry focuses, not on the nature of the loss and the terms of the insurance contract, but on the conduct of the insurer. . . . In a CUIPA and CUTPA claim, the insurer's duty stems not from the private insurance agreement but from a duty imposed by statute." Id. Thus, when the plaintiff moved for partial summary judgment on the issue of whether "National Union violated the Connecticut Unfair Insurance Practices Act and the Connecticut Unfair Trade Practices Act" and expressly stated that "there are no facts in dispute which would prevent this Court from ruling on . . . [its] CUTPA and CUIPA claims," it acknowledged that the court could treat the issue as a question of law. See Practice Book §§ 380, 384. Further, the defendants filed no affidavits in connection with this claim and thereby raised no genuine issue of material fact.

We have scrutinized the plaintiff's motion for partial summary judgment, the defendants' motion for summary judgment and all the supporting memoranda, and conclude that the trial court properly rendered summary judgment in favor of the defendants. Although the plaintiff contends that the trial court "confused" the various counts in the complaint and granted summary judgment on the wrong counts, we are persuaded that the trial court carefully reviewed the plaintiff's factual allegations in light of the defendants' motion for summary judgment. Moreover, it is clear that the trial court reasonably construed the plaintiff's motion for partial summary judgment, and correctly ruled on the merits of those arguments presented to the court.

## A

In its motion for partial summary judgment, the plaintiff moved the trial court to find that: (1) the defendants "are obligated under either or both of their insurance policies to pay on behalf of [the plaintiff] any expenses, by way of defense and/or liability, incurred by [the plaintiff] in connection with the fuel oil product spill from [its] property into Stamford Harbor; (2) . . . [the defendants] have waived any purported defenses to coverage as a result of their untimely denials of coverage; and (3) National Union violated the Connecticut Unfair Insurance Practices Act and the Connecticut Unfair Trade Practices Act." The plaintiff supported this motion with a memorandum referring generally to "the Connecticut Unfair Insurance Practices Act" and "the Connecticut Unfair Trade Practices Act," while also referring more specifically to §§ "38a-815 et seq.," "38a-816" and "38a-816 (1) (f)" of CUIPA and "§ 42-110 (b)" of CUTPA.

Although the plaintiff now claims that the third count of the complaint alleged a violation of General Statutes

§ 38a-816, that count made no mention whatsoever of that statute. The third count alleged in relevant part: "National Union's wrongful attempts to alter and to cancel insurance policies subsequent to notification of a claim from their policyholder constitute breach of contract, misrepresentation, and violations of common law as well as *C.G.S. Sections 38a-321*, all to the harm and detriment of the Plaintiff." (Emphasis added.) Section 38a-321 is entitled "Liability of insurer under liability policy," and it is not within either CUTPA or CUIPA. It is evident that the trial court applied its CUTPA and CUIPA analysis only to the fourth and fifth counts, the two counts stating causes of action under CUTPA and CUIPA. Indeed, it became clear that the trial court had not expressly analyzed the third count in its memorandum of decision on the motion for summary judgment when it subsequently, and *without opposition*, granted judgment nunc pro tunc on the third and sixth counts. See footnote 15. Thus, this claim relating to the third count is meritless.

B

The plaintiff also claims that the trial court improperly granted the motion for summary judgment in favor of the defendants on the fourth and fifth counts of the complaint. The plaintiff contends that because it had moved for partial summary judgment only on the third count and not on the fourth and fifth counts, the trial court improperly granted the motion for summary judgment sua sponte on the fourth and fifth counts.

As discussed previously, the plaintiff broadly moved in its motion for partial summary judgment that the court declare "that National Union violated the Connecticut Unfair Insurance Practices Act and the Connecticut Unfair Trade Practices Act." By doing so, it represented to the court, in effect, that there existed no genuine issue of material fact relative to those

claims. The wording of this portion of the motion, however, implicitly created two problems for the trial court. First, the language failed to specify the particular count or counts in the complaint upon which the plaintiff was moving. Second, this language failed to articulate the specific section or sections of CUTPA or CUIPA upon which the plaintiff was relying.

As to the first problem, it is clear from the memorandum of decision that the trial court, despite the plaintiff's numbering of this part of its motion as "(3)," recognized that the plaintiff was not moving for summary judgment on the third count of its complaint. As stated previously, the third count of the complaint specifically referenced only § 38a-321. Instead, the trial court correctly discerned that the substance of the plaintiff's argument related only to the fourth and fifth counts, the counts expressly referencing sections of CUTPA and CUIPA, and that the designation "(3)" referred only to that claim's relative position within the motion for partial summary judgment.

As to the second problem, the trial court obviously treated the plaintiff's motion as one for summary judgment on the fourth and fifth counts of the complaint. In doing so, the trial court necessarily ruled on the plaintiff's claims under § 38a-816 (1), (2) and (6) of CUIPA, as well as General Statutes § 42-110 et seq. of CUTPA. The plaintiff now argues that it had moved for summary judgment only on its count grounded in § 38a-816 (1) and (2), which the plaintiff now argues is the third count but, in fact, is the fifth count of the complaint. More precisely, the plaintiff contends that the trial court: (1) improperly granted the motion for summary judgment in favor of the defendants on its claim under § 38a-816 (1) and (2); and (2) improperly had considered on the motion its claim pursuant to § 38a-816 (6) because it had not moved for summary judgment on that claim. We disagree.

1

Section 38a-816 (1) prohibits misrepresentations and false advertising of insurance policies. Section 38a-816 (2) prohibits false information and advertising generally. The plaintiff alleges in its complaint that the defendants have violated, inter alia, these sections by the following conduct: their "wrongful attempts to alter and to cancel the Plaintiff's insurance policies"; the response to the plaintiff's notice and claims for coverage; misrepresentations as to the terms, facts, conditions, and provisions of insurance policies; false advertising; and/or false information and/or advertising generally. The factual basis for this motion was substantiated through affidavits; the defendants filed no affidavits.

On appeal, the plaintiff argues, as it did to the trial court on its motion for partial summary judgment, that National Union made two misrepresentations that "induced" or "tended to induce" a lapse of insurance coverage in violation of § 38a-816 (1) (f).[26] First, it contends that National Union's failure to issue a policy, while charging a premium, "tended to induce" it into letting its coverage lapse. Second, it claims that National Union misrepresented that it had failed to pay its premiums and "induced lapse" by sending the cancellation notice following the claim for the fuel oil spill.[27] We conclude that the trial court correctly granted the motion for summary judgment on this issue because these facts, even though uncontroverted, fail to support a CUIPA claim under § 38a-816 (1) (f) and therefore fail to support a CUTPA claim.

[26] The plaintiff has narrowed its original claim under § 38a-816 (1) and (2) generally to include on appeal only a claim under § 38a-816 (1) (f).

[27] The plaintiff cites as evidence of a potential lapse in coverage an affidavit from its corporate officer, which states that National Union's notice of cancellation potentially had created a gap in coverage from the effec-

Although the plaintiff emphasizes that § 38a-816 (1) (f) prohibits misrepresentations inducing or tending to induce a lapse in insurance coverage, it ignores the fact that the subsection actually prohibits misrepresentations *"for the purpose of* inducing or tending to induce . . . [a lapse in coverage.]"* (Emphasis added.) As a result, regardless of whether there is a misrepresentation that induces or tends to induce a lapse in coverage, the plain language of the statute permits recovery only if an insured establishes that its insurer made a purposeful misrepresentation. To show such a purposeful misrepresentation, an insured must necessarily produce evidence that the insurer acted intentionally. See *Wadia Enterprises, Inc.* v. *Hirschfeld*, supra, 224 Conn. 248–49 (plaintiff must show intentional conduct to establish "dishonest purpose"). Because the plaintiff moved for summary judgment on this count and there were no contradictory affidavits, the court properly decided the motion by looking only to the sufficiency of the plaintiff's affidavits and other proof. See Practice Book § 384. Thus, this claim must fail because although the plaintiff places great emphasis on its uncontradicted affidavits from one of its corporate officers, the affidavits show, at most, that National Union used somewhat lax clerical or administrative procedures, and not that National Union intended to induce or to tend to induce a lapse in coverage.[28] See *Wadia Enterprises, Inc.* v. *Hirschfeld*, supra, 248–49 (proof of mere negligence fails to support showing of dishonest purpose); see also *Haesche* v. *Kissner*, 229 Conn. 213, 216, 640 A.2d 89 (1994)

tive date of the notice of cancellation until one week later when National Union extended by endorsement the original policy.

[28] The plaintiff also contends that the trial court granted summary judgment against it on its claim under § 38a-816 (1) (f) based on a mistaken assumption that it had to prove a general business practice. We are unpersuaded that the trial court relied on such an assumption in resolving that claim.

(summary judgment appropriate if "fair and reasonable" person could conclude only one way).

## 2

Section 38a-816 (6) prohibits unfair claim settlement practices. Under this section of CUIPA, the claimant must allege and prove facts sufficient to show that the insurer was "[c]ommitting or performing [certain specified acts] with such frequency as to indicate a general business practice . . . ." General Statutes § 38a-816 (6). The plaintiff admits that it failed to show the requisite "general business practice" under this section, but contends that it never moved for summary judgment on this issue. Moreover, it contends that it should be entitled to obtain discovery on this issue to prove a sufficient "general business practice." We are unpersuaded.

As the party moving for summary judgment, the plaintiff is required to support its motion with supporting documentation, including affidavits. Practice Book § 380. Further, because the plaintiff moved on its statutory claims under CUTPA and CUIPA, it was required to identify the specific numbers of those statutes. Practice Book § 109A. Although we have held that Practice Book § 109A is directory rather than mandatory; *Rowe* v. *Godou*, 209 Conn. 273, 550 A.2d 1073 (1988); the purpose underlying the requirements of Practice Book § 109A is instructive. "The purpose of this rule, adopted in 1979, is self-evident. No such procedural rule existed prior to that time. It was clearly designed to make future pleadings more specific, detailed and particularly informative by pinpointing statutory authority. Such a rule promotes the often expressed judicial policy of full, informative, comprehensive and open disclosure of legal claims, which promotes the *identification,* narrowing and resolution of issues before the

court." (Emphasis added.) *Rowe* v. *Godou*, 12 Conn. App. 538, 543–44, 532 A.2d 978 (1987), rev'd on other grounds, 209 Conn. 273, 550 A.2d 1073 (1988).

In light of this policy and the plaintiff's failure to articulate its motion clearly, we cannot conclude, as a matter of law, that the trial court improperly construed the scope of the plaintiff's motion for partial summary judgment. Faced with a broadly worded motion and supporting memoranda containing general references to CUIPA and CUTPA, the trial court reasonably interpreted the pleadings to mean that the plaintiff sought summary judgment on all of its CUIPA and CUTPA claims. Although we acknowledge that the plaintiff made a few isolated references in its memoranda and at oral argument on the motion which might have indicated that it did not seek summary judgment on its claim under § 38a-816 (6),[29] these references must be considered in the light of the expansive language and general citations to "CUTPA" and "CUIPA" also presented to the trial court. Thus, we cannot find that the trial court's failure to interpret these references as limiting the motion constituted an abuse of discretion. Consequently, the trial court properly granted the motion for summary judgment on this claim in favor

---

[29] The plaintiff argues that its request for partial summary judgment was "outlined clearly in [its] briefs and in the transcript of the October 5, 1992 Hearing." Further, the plaintiff asserts that the fact that it neither requested nor received any discovery related to showing the requisite "general business practice" demonstrates that it never moved on that claim. Also, the plaintiff cites the following statement it made at the oral argument on the motion: "In summary, Your Honor, [the plaintiff] seeks summary judgment on three of the six counts and no matter how the court rules on those three counts there are three remaining counts, that according to the Connecticut Supreme Court in the *Williams* case, since those counts involve proving a general business practice under the Connecticut Unfair Insurance Practices Act and the Connecticut Unfair Trade Practices Act, the lead court said that those acts are separate from the policy and, therefore, [the plaintiff] is entitled to recovery on these other counts and the defendants' motion for a protective order should be denied."

of the defendants and correctly denied the plaintiff's request for discovery.[30]

The judgment of the trial court is affirmed.

In this opinion PETERS, C. J., and CALLAHAN and PALMER, Js., concurred.

BERDON, J., dissenting. I disagree with the majority's analysis and conclusions on both the procedural aspects of summary judgment and the substantive issue in this case. First, I am troubled by the majority's approval of the trial court's decision to render judgment against the plaintiff when the plaintiff had moved only for a partial summary judgment and when it never had an opportunity to contest issues of fact and law on the remaining legal issues. Second, I believe the majority, like the trial court, incorrectly characterizes the word "pollutants" as clear and unambiguous. Finally, I believe the trial court was incorrect in refusing to allow the plaintiff to engage in discovery on certain legal issues.

I

The availability of summary judgment as an expeditious means to resolve cases in which there is no genuine dispute between the parties about material facts is, of course, essential to the administration of civil justice. I believe the majority's holding in this case will significantly impede the effectiveness of this remedy. Indeed, as a result of this holding, parties who rely on multiple theories of liability will be reluctant to move for summary judgment on just one theory. They will

[30] Because we hold that the trial court did not abuse its discretion in considering all of the plaintiff's CUTPA and CUIPA claims on the motion for partial summary judgment, it is clear that the plaintiff's failure to offer evidence showing a "general business practice" fatally flaws its claim under § 38a-816′(6), which requires proof of such a general business practice. See *Lees* v. *Middlesex Ins. Co.*, 229 Conn. 842, 847–48, 643 A.2d 1282 (1994).

fear—quite understandably, in my view—that the mere act of moving for summary judgment on certain theories of liability will make them vulnerable to summary judgment in favor of their opponents on all theories, even if those other theories require discovery or involve significant factual disputes.

The plaintiff, Heyman Associates No. 1, brought this action against the defendants, the Insurance Company of the State of Pennsylvania (ISOP) and the National Union Fire Insurance Company of Pittsburgh, Pennsylvania (National Union), in six counts. In order, the counts alleged that, first, the insurance contracts required coverage of the plaintiff's claim; second, the defendants had waived the right to contest coverage; third, the defendants had violated General Statutes § 38a-321; fourth, the defendants had violated the Connecticut Unfair Insurance Practices Act (CUIPA)[1] and the Connecticut Unfair Trade Practices Act (CUTPA),[2] in particular General Statutes § 38a-816 (6), which prohibits unfair claim settlement practices; fifth, the defendants had violated CUIPA and CUTPA, in particular General Statutes § 38a-816 (1), which prohibits misrepresentations and false advertising of insurance policies, and § 38a-816 (2), which prohibits false information and advertising generally; and sixth, the defendants had breached a covenant of good faith and fair dealing.

The plaintiff thereafter moved for partial summary judgment. In its memorandum of law in support of its motion, the plaintiff made clear that it was seeking summary judgment only on the issues of whether the insurance contract provided coverage and whether the defendant had waived the right to contest coverage. The plaintiff also indicated that it was moving for

[1] General Statutes § 38a-815 et seq.; see footnote 7 of the majority opinion.

[2] General Statutes § 42-110a et seq.

summary judgment on the issue of whether only one of the defendants, National Union, had "violated [CUIPA and CUTPA] by wrongfully withholding a copy of the insurance policy sold to [the plaintiff] and by attempting to cancel [the plaintiff's] insurance coverage after [the plaintiff] gave notice of the claim . . . ." More specifically, the plaintiff argued that National Union had violated § 38a-816 (1) (f).[3]

The defendants responded by filing a cross motion for summary judgment. The language of the cross motion itself pertained only to the contract's coverage[4] and the accompanying affidavit and exhibits pertained only to that issue. In their memorandum of law in support of their motion and in opposition to the plaintiff's motion, however, the defendants also discussed whether they had waived their right to exclude coverage and whether National Union had violated § 38a-816 (1) (f).

Considering these motions in light of the allegations set forth in the complaint, the parties moved for summary judgment *at most* on (i) one legal theory pertaining to the first count, (ii) the second count, and (iii) that very limited portion of the fifth count that had alleged a violation by one of the two defendants, National Union, of § 38a-816 (1) (f). In other words, several

[3] Contrary to the majority's sweeping statement that the plaintiff had filed only "a broadly worded motion and supporting memoranda containing general references to CUIPA and CUTPA," § 38a-816 (1) (f) was the only specific provision that the plaintiff contended National Union had violated.

[4] The defendants' motion for summary judgment was worded as follows: "Pursuant to Practice Book § 378 et seq., the defendants, Insurance Company of the State of Pennsylvania (ISOP) and National Union Fire Insurance Company of Pittsburgh, Pa. (National Union), hereby move that the Court grant their Cross-Motion for Summary Judgment and declare that [the] Defendants have no obligation to provide coverage for defense and/or indemnity costs that Heyman Associates has or will incur in connection with the fuel oil spill from Heyman Associates' property in the Stamford Harbor, Stamford, Connecticut."

counts remained on which neither the plaintiff nor the defendants had moved for summary judgment. These included other theories of liability under the first count; the third,[5] fourth and sixth counts; and that portion of the fifth count that had alleged violations by National Union of § 38a-816 (2) and § 38a-816 (1) (a) and (e), and all of the fifth count with respect to the other defendant, ISOP.[6]

Nevertheless, after oral argument on the motions, the trial court rendered summary judgment against the plaintiff and in favor of the defendants on all counts of the complaint.[7] In other words, the trial court rendered summary judgment for the defendants on theories of liability and counts on which neither party had sought summary judgment and on which neither party had the opportunity to present affidavits of fact or to argue the law.

I have been unable to find any authority in this state, in either appellate or trial court decisions, for the proposition that a court may render summary judgment on issues in favor of a party who did not move on those

---

[5] I agree with the majority that the plaintiff's argument that it moved for summary judgment on, inter alia, count *three* of the complaint is wholly without merit. That count alleged that the defendants had violated General Statutes § 38a-321. This statute does not lie within either CUIPA or CUTPA and, in fact, has nothing to do with either act.

[6] In count five of its complaint, the plaintiff enumerated those acts and practices of National Union which it believed violated § 38a-816 (1) and (2). "These acts and practices include but are not limited to: any of the conduct alleged in this complaint, including but not limited to wrongful attempts to alter and to cancel [the] Plaintiff's insurance policies; the response to [the] Plaintiff's notice and claims for coverage; misrepresentations as to the terms, facts, conditions, and provisions of insurance policies; false advertising; and/or false information and/or advertising generally." Within § 38a-816, subsections (a) and, possibly, (e) are the only subsections other than subsection (f) to which this description might apply.

[7] For reasons I will explain in part II of this dissent, I agree that the trial court would have been correct in denying the plaintiff's motion for summary judgment on the three counts on which it had moved.

issues. Nevertheless, I do not disagree with the theoretical application of such a rule. If both sides agree that there are no genuine issues of fact in dispute and that the court may render judgment as a matter of law, the mere fact that a party has neglected to file a cross motion on all the counts or on all theories of liability within a count should not prevent the court from rendering judgment. After all, "the form of the pleadings should not place a limitation upon the power of the court to do justice." 6 J. Moore, Federal Practice (2d Ed. 1994) § 56.12, p. 56-161. Moreover, federal courts have long followed such a rule; see, e.g., *Coach Leatherware Co.* v. *Anntaylor, Inc.*, 933 F.2d 162 (2d Cir. 1991); *Lowenschuss* v. *Kane*, 520 F.2d 255 (2d Cir. 1975); and our state summary judgment rule is closely patterned after the federal rule. *Plouffe* v. *New York, N.H. & H. R. Co.*, 160 Conn. 482, 280 A.2d 359 (1971); *New Haven Redevelopment Agency* v. *Research Associates, Inc.*, 153 Conn. 118, 214 A.2d 375 (1965).

The mere theoretical existence of such a rule, however, does not mean that a court may apply it haphazardly in any situation in which a party has moved for partial summary judgment. Indeed, "whenever the court believes that the nonmoving party is entitled to judgment, great care must be exercised to assure that the original movant has had an adequate opportunity to show that there is a genuine issue and that his opponent is not entitled to judgment as a matter of law." 10A C. Wright, A. Miller & M. Kane, Federal Practice and Procedure (2d Ed. 1983) § 2720, p. 34; see J. Moore, supra, § 56.12, p. 56-165 ("[c]are should, of course, be taken by the . . . court to determine that the party against whom summary judgment is rendered has had a full and fair opportunity to meet the proposition that there is no genuine issue of material fact to be tried, and that the party for whom summary judgment is rendered is entitled thereto as a matter of law").

In this case, it is absolutely clear that the plaintiff neither conceded that there were no material facts in dispute nor had an opportunity to rebut the court's consideration of judgment for the nonmoving party. On the contrary, several facts evident in the record indicate that the plaintiff was taking all necessary steps to go forward with the prosecution of the balance of its case when the trial court abruptly rendered summary judgment against it on all counts.

First, as indicated above, the plaintiff's motion sought summary judgment on only a limited number of the allegations in its complaint. The plaintiff obviously believed that only these counts or legal theories were appropriate for summary judgment, and that it would have to go to greater lengths—such as engaging in extended discovery or conducting a trial on the merits—in order to pursue the remaining counts. Indeed, the plaintiff's memorandum of law in support of its motion for partial summary judgment clearly limited the subject matter of the motion to the issues I have identified above.[8]

Second, the plaintiff emphasized to the trial court at the hearing on its motion for partial summary judgment that only a portion of the complaint was before the court. As the plaintiff explained to the court: "In summary, Your Honor, [the plaintiff] seeks summary judgment on three of the six counts and no matter how the court rules on those three counts there are three

---

[8] The opening paragraph of the plaintiff's memorandum of law in support of its motion provided in part: "By this motion, [the plaintiff] seeks the following declarations: (1) that [the] defendants . . . are obligated under either or both of their insurance policies to pay for any expenses incurred by [the plaintiff], by way of defense and/or liability, in connection with the fuel oil product spill; (2) that [the defendants] have waived any purported defenses to coverage as a result of their untimely denials of coverage; and (3) that National Union violated [CUIPA and CUTPA] by wrongfully withholding a copy of the insurance policy sold to [the plaintiff] and by attempting to cancel [the plaintiff's] insurance coverage after [the plaintiff] gave notice of the claim that is the subject matter of this action."

remaining counts, that according to the Connecticut Supreme Court . . . since those counts involve proving a general business practice under the Connecticut Unfair Insurance Practices Act and the Connecticut Unfair Trade Practices Act, the lead court said that those acts are separate from the policy and, therefore, [the plaintiff] is entitled to recovery on these other counts . . . .''

Third, the plaintiff had requested discovery on several of the remaining issues in the complaint, including the general business practices of the defendants in settling claims. This issue, of course, was enumerated in count four of the complaint, a count not advanced by either the plaintiff or the defendants in their motions for summary judgment.

Fourth, even as to the first count, the plaintiff had sought discovery on alternate theories of liability, including whether the defendants had complied with state insurance laws.[9]

Despite the plaintiff's entreaties, the trial court nevertheless rendered summary judgment against the plaintiff on all counts, effectively putting the plaintiff out of court. Making the trial court's action particularly egregious was the fact that the sole affidavit submitted by the defendants pertained only to the first count of the complaint. The trial court later justified its action, however, by suggesting that simply by moving for partial summary judgment, the plaintiff had "represented to the court that no genuine issues of material fact existed," and that the court therefore was entitled to render judgment on every count in the complaint.[10]

---

[9] See part III B of this dissent.

[10] The court made this statement in its memorandum of decision refusing to open the judgment or to hear reargument on the motions for summary judgment.

There is nothing in our Practice Book to suggest that a party, merely by moving for partial summary judgment, thereby admits that there are no genuine issues of material fact remaining on all other allegations of its complaint. See Practice Book § 378 et seq. Although the Practice Book does provide that a court may render judgment only "if the pleadings, affidavits and any other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law"; Practice Book § 384; this provision cannot be twisted to mean that a motion for partial summary judgment is equivalent to an implicit representation by the moving party that there is no question of fact on different theories of liability or defenses.

This simply is not a proper statement of the law. If it were, summary judgment would become merely a dangerous trap for the unwary litigant. Indeed, if this were the law, a litigant who might have several legal theories to support his position would be reluctant to move for summary judgment on any single theory because, merely by doing so, he would be exposing himself to an adverse summary judgment on all other theories for which discovery was necessary or in which there was a factual dispute. Motions for summary judgment, therefore, would lose much of their effectiveness for limiting issues or disposing of litigation on a theory for which there is no factual dispute.

The majority claims that it is justified in upholding the trial court because the plaintiff stated in its brief that "there are no facts in dispute which would prevent this Court from ruling on either [the plaintiff's] insurance coverage or CUTPA and CUIPA claims." The majority equates this to a judicial admission. That statement, however, when read in the context of the plaintiff's brief, does not support the majority's position. The plaintiff made this statement on the last page

of its memorandum of law in support of its summary judgment motion. The opening statement of the plaintiff's memorandum of law in support of its motion, as I previously pointed out,[11] had focused only on counts one, two and that portion of count four in which the plaintiff moved for summary judgment against National Union under § 38a-816 (1) (f) of CUIPA and, correspondingly, CUTPA. The plaintiff's concluding statement, that "there are no facts in dispute which would prevent this Court from ruling on either [the plaintiff's] insurance coverage or CUTPA and CUIPA claims," obviously referred only to the claims it had advanced in support of its motion and not to all of the other counts or theories of liability it had alleged in its complaint. Furthermore, even if the plaintiff had conceded the facts on all counts of its complaint, it still had a right to be heard by the trial court on the issues of law. The plaintiff was never afforded this opportunity.

The majority's rush to judgment in this case is troubling. The trial court's rendering of summary judgment for the defendants on all counts of the complaint has deprived the plaintiff of fundamental justice and the right to be heard in a meaningful manner. But the majority's decision to uphold the trial court's decision will not be limited to this plaintiff or to this case. The effects of the court's decision today will reverberate through Connecticut practice and, inevitably, will dissuade future litigants from moving for summary judgment.

II

Aside from my concern with the summary judgment aspects of this case, I believe that the word "pollutants" in the exclusion clauses of the insurance policies at issue is far from being clear and unambiguous. The trial

---

[11] See footnote 8 of this dissent.

court, therefore, should not have rendered summary judgment for either party.

Several courts have arrived at quite different meanings when interpreting clauses with identical or very similar language to the exclusion in issue here. In *Westchester Fire Ins. Co.* v. *Pittsburg*, 794 F. Sup. 353 (D. Kan. 1992), aff'd sub nom. *Pennsylvania National Mutual Casualty Ins. Co.* v. *Pittsburg*, 987 F.2d 1516 (10th Cir. 1993), the court ruled that an exclusion identical to the one involved in this case was ambiguous. Noting that the term "pollutants" was broadly defined as " 'any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste,' " the court held that the "[l]ack of precision in the definition of 'pollutants' renders the entire exclusion ambiguous." Id., 354, 355.

In *West* v. *Board of Commissioners*, 591 So. 2d 1358, 1360 (La. App. 1991), the court held that an exclusion with nearly identical language to the clause in this case[12] applied only to "those who indifferently pollute our environment—and not to those who only incidentally possess the pollutant in the course of their other business . . . ."

---

[12] The majority attempts to distinguish this holding by suggesting that the court in *West* "construed an exclusion with language different than that at issue in this case." Any differences, however, are strictly cosmetic and of no legal significance. In *West*, the clause excluded coverage for injury "arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants . . . ." *West* v. *Board of Commissioners*, supra, 591 So. 2d 1360. The exclusion in this case merely breaks down that clause into two smaller and more readable parts. The clause first excludes coverage for injury "arising out of the alleged or threatened discharge, dispersal, release or escape of pollutants." The clause then defines "pollutants" as "any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste material." The exclusions in the two cases, therefore, perform the same function in virtually identical ways.

Finally, in *Atlantic Mutual Ins. Co.* v. *McFadden*, 413 Mass. 90, 595 N.E.2d 762 (1992), the court explained that an identical exclusion, when read in its entirety, was limited in its effect. "[T]he terms used in the pollution exclusion, such as 'discharge,' 'dispersal,' 'release,' and 'escape,' are terms of art in environmental law which generally are used with reference to damage or injury caused by improper disposal or containment of hazardous waste." Id., 92.

These cases make clear that it is impossible for a court to say that the term "pollutants" in an exclusion such as is involved here is perfectly clear and unambiguous. Indeed, the well reasoned opinions of these courts reveal that such clauses are susceptible to multiple interpretations.

Furthermore, the majority cannot bolster its already strained analysis of the pollution exclusion by relying on General Statutes § 22a-451 (a). That provision imposes liability on a party who "causes *pollution* . . . through the discharge, spillage, uncontrolled loss, seepage or filtration of *oil or petroleum* . . . ." (Emphasis added.) The majority relies on this provision to suggest that pollution therefore includes oil and petroleum in all equivalent situations. As the court correctly recognizes elsewhere in its opinion, however, such an argument "seems to undermine rather than bolster" its argument, because "a legislature likely would have no need" to enumerate oil or petroleum as a form of pollution unless it believed that oil or petroleum was originally outside the ordinary meaning of that term.

It is clear, therefore, that the trial court should have allowed the parties to introduce extrinsic evidence to explain the meaning of the clause that the parties actually intended; see *Bead Chain Mfg. Co.* v. *Saxton Products, Inc.*, 183 Conn. 266, 272–73, 439 A.2d 314 (1981); and summary judgment should not have been rendered for either party.

## III

In addition to arguing that the exclusion is ambiguous, the plaintiff raised two other theories of liability on the insurance contract which would have required discovery. First, the plaintiff argued that it required discovery to prove a latent ambiguity in the language of the exclusion. Second, the plaintiff argued that the clause was ineffective because the defendants had failed to comply with state insurance laws. I believe the trial court should have allowed the plaintiff an opportunity to conduct discovery on these issues.

## A

The majority dismisses in summary fashion the plaintiff's argument that the exclusion is latently ambiguous and, therefore, that the trial court should have allowed the plaintiff discovery to gather evidence of the parties' intent. According to the rather tortured analysis supplied by the majority, the trial court was justified in its decision because (1) traditionally, latent ambiguity exists where a writing is apparently clear on its face, but upon application to external objects is found to fit two or more equally; (2) the plaintiff "can offer no Connecticut precedent to support its reliance on latent ambiguity"; and (3) out-of-state precedents cited by the plaintiff fail to comport with the traditional view of latent ambiguity. None of these premises, however, is completely accurate.

First, although the majority has properly quoted a "traditional" definition of latent ambiguity, it fails to recognize that other scholars and courts, including this court, have either defined or applied the concept differently. Professor Hunter, for example, has noted that "latent ambiguity arises when the language of the contract can be construed in two or more ways, both or all of which are compatible with the language used."

H. Hunter, Modern Law of Contracts (1993) § 7.03 [2] [a], pp. 7-12–7-13. The Texas Supreme Court explained that under the latent ambiguity rule, "even though a written contract be unambiguous on its face, parol evidence is admissible for the purpose of applying the contract to the subject with which it deals; and if by reason of some collateral matter an ambiguity then appears, proof of the facts and circumstances under which the agreement was made is admissible, in order that the language used in the contract may be read in the light thereof for the purpose of ascertaining the true intention of the parties as expressed in the agreement." *Murphy* v. *Dilworth*, 137 Tex. 32, 36, 151 S.W.2d 1004 (1941).

This court, moreover, has used the term "latent ambiguity" to encompass ambiguity in the plain language of an insurance policy, regardless of how that language applies to external facts. In *Beach* v. *Middlesex Mutual Assurance Co.*, 205 Conn. 246, 247, 532 A.2d 1297 (1987), this court held that "there is latent ambiguity in the term 'collapse' in a homeowner insurance policy." Chief Justice Peters, writing for the majority, acknowledged that the defendant insurance company had offered a plausible interpretation of that term as meaning "casualty of a sudden and cataclysmic nature." Id., 251. The court concluded, however, that "an alternate reading is equally reasonable, and that is sufficient to defeat the defendant's claim of error." Id.

Second, contrary to the assertion of the majority, this court has expressly recognized the validity of the doctrine of latent ambiguity to allow a court to use extrinsic evidence to interpret the provisions of a contract. In *Cody* v. *Remington Electric Shavers*, 179 Conn. 494, 500, 427 A.2d 810 (1980), this court acknowledged that "it is true that extrinsic evidence is admissible to assist the court in resolving the question of intent where the terms of a written contract are either latently or patently ambiguous . . . ."

Finally, while it is arguable that the out-of-state decisions cited by the plaintiff do not comport with the "traditional" view of latent ambiguity, they certainly do comport with the other definitions proffered by scholars and courts. In fact, the decision by the Texas Court of Appeals in *CBI Industries, Inc.* v. *National Union Fire Ins. Co.*, 860 S.W.2d 662 (Tex. App. 1993), writ granted, 37 Tex. Sup. Ct. J. 670 (1994), comports with such a view and is directly on point with this case. In *CBI Industries, Inc.*, the plaintiff argued that the words "pollution," "pollutants" and "to pollute" in an insurance exclusion were ambiguous and, as a consequence, that summary judgment for the defendants was inappropriate. Id., 664. The Texas court, reciting the Texas Supreme Court's definition of latent ambiguity in *Murphy* v. *Dilworth*, supra, 137 Tex. 36, held that the plaintiff "was entitled to attempt to show a latent ambiguity in the exclusions" and that summary judgment was therefore inappropriate. *CBI Industries, Inc.* v. *National Union Fire Ins. Co.*, supra, 665–66.

Accordingly, I would hold that the trial court should have allowed the plaintiff an opportunity to discover evidence of the parties' intent before rendering summary judgment for either party.[13]

---

[13] While it is true that under the "Four Corners" doctrine a court may not consider any extrinsic evidence unless a contract is ambiguous, the more modern view, propounded by Professor Corbin, recognizes that "the meaning of language may vary greatly according to the circumstances" and that "all language is infected with ambiguity and vagueness and that even language that seems on its face to have only one possible meaning may take on a different meaning when all the circumstances are disclosed . . . ." E. Farnsworth, Contracts (1990) § 7.12, pp. 277–78. Under this theory, extrinsic evidence is always available to be used for interpreting the intent of the parties. Id., p. 272. After all, as Professor Corbin observed, "[n]o contract should ever be interpreted and enforced with a meaning that neither party gave it." 3 A. Corbin, Contracts (Sup. 1993) § 572B, p. 427; see 2 Restatement (Second), Contracts § 212, comment (b), and § 209, com-

## B

Finally, the trial court should have allowed the plaintiff to conduct discovery on the issue of whether the defendants had complied with state insurance law by filing the exclusionary clauses with the state insurance commission. Our rules of practice make clear that "[s]hould it appear from the affidavits of a party opposing the motion that he cannot, for reasons stated, present facts essential to justify his opposition, the court may deny the motion for judgment or may order a continuance to permit affidavits to be obtained or discovery to be had or may make such other order as is just." Practice Book § 382. Discovery was essential in order for the plaintiff both to prosecute and to counter the defendants' arguments on the legal theories that the plaintiff did not advance under its motion for partial summary judgment. See *American Fidelity & Casualty Co.* v. *London & Edinburgh Ins. Co.*, 354 F.2d 214, 216 (4th Cir. 1965). Indeed, the plaintiff had

ment (a) (1981); see also Uniform Commercial Code, General Statutes § 42a-2-202.

In *Sims* v. *Honda Motor Co.*, 225 Conn. 401, 623 A.2d 995 (1993), this court embraced Corbin's modern approach. In *Sims*, we interpreted the meaning of a general release agreement signed by the injured plaintiff. The plaintiff had signed the contract with the intent of releasing only one defendant from liability, but the contract expressly discharged from liability "any and all" other parties from "any and all" claims arising from the incident. Id., 404. Chief Justice Peters, writing for the majority, declined to enforce the plain meaning of the all encompassing release, and instead adopted a Corbin-like approach which "provides for consideration of extrinsic evidence of the parties' actual intent and does not confine interpretation of the release to its four corners." Id., 413.

Under this view, of course, the trial court in this case should not have rendered summary judgment for either party without first considering extrinsic evidence which may have shed light on the meaning they attached to the word "pollutants" at the time they formed their contract. Such extrinsic evidence may properly have included evidence of usage of the trade, including any pollution exclusions that the defendants and other insurance companies had utilized, as well as communications between the parties prior to the signing of the contract.

repeatedly requested discovery, but the court granted a protective order that shielded the defendants from these requests.

After the trial court rendered summary judgment against the plaintiff on all counts, the plaintiff asked the court to open the judgment. The plaintiff argued, inter alia, that it never had an opportunity to conduct discovery on the issue of whether the defendants had complied with state insurance law by filing the exclusionary clauses with the state insurance commission. The trial court, however, denied the plaintiff's motion, concluding that the plaintiff had never raised this issue prior to the court's rendering of summary judgment and therefore had waived it.

The record, however, clearly shows that the plaintiff did indeed raise this issue early in the proceedings. First, the plaintiff had demonstrated, in its memorandum in opposition to the defendants' motion for a protective order to prohibit discovery, that it had attempted to obtain this information from the insurance commissioner and had even attempted to invoke the aid of the freedom of information commission months before the trial court's decision on the motions for summary judgment.[14] Second, in its reply memorandum of law in sup-

[14] In its opposition to the defendants' motion for a protective order dated April 13, 1992, the plaintiff attached to its objection the following affidavit of its attorney: "3. On May 29, 1992, and June 18, 1992, I went to the office of the Connecticut Department of Insurance to determine whether the Connecticut Department of Insurance: (1) had approved the insurance policy language of the defendants' insurance policies at issue, including but not limited to, the so-called 'absolute pollution exclusion' language relied upon by [the] defendants in this case; and (2) to inspect any filings these defendants have made with respect to the policies at issue. I specifically requested any documentation related to the so-called 'absolute pollution' exclusions.

"4. On June 30, 1992, July 31, 1992, and August 19, 1992, I wrote to the Connecticut Department of Insurance and asked whether the Connecticut Department of Insurance authorized [the] defendants to change from the so-called 'sudden and accidental' pollution exclusion to the so-called

port of its motion for partial summary judgment, the plaintiff had argued that it "should be afforded an opportunity to conduct discovery of the statutory filings affecting [the] defendants' policies."

The majority, perhaps recognizing that the trial court was incorrect on this point, nevertheless holds that the court properly rejected the plaintiff's discovery request because the plaintiff, by moving for partial summary judgment, "accelerated the very process of which it complained," because the record demonstrated "that the plaintiff had sought discovery on the defendants' filings with the commissioner of insurance only to show the defendants' intent regarding the exclusionary language," and because the plaintiff did not "discuss the consequences of an insurer's failure to file an exclusion."

There are several problems with the majority's cursory analysis of this claim of error. First, the plaintiff made clear to the trial court that, while it was moving for summary judgment on certain counts and certain theories of liability, it nevertheless was seeking discovery on other counts and other theories of liability.[15] The

'absolute pollution' exclusion. I specifically requested any documentation relating to any such authorization. Copies of the letters that I sent are attached hereto as Exhibit A. To date, I have not received any response.

"5. On August 31, 1991, I wrote to the Freedom of Information Commission to request the Commission's assistance in obtaining this information. A copy of my August 31, 1991 letter is attached as Exhibit B.

"6. On September 17, 1992, I was informed by the Freedom of Information Commission that they are five to six months behind on processing complaints and are currently processing April complaints."

[15] In the plaintiff's reply memorandum of law in support of its motion for partial summary judgment, the plaintiff wrote: "[The d]efendants also have cross-moved for summary judgment. This motion should be denied for the same reasons that summary judgment should be entered for [the plaintiff] on the defendants' duty to defend [the plaintiff]. However, in the event that the defendants' cross-motion is not denied summarily, [the plaintiff] should be allowed to conduct discovery: (1) to establish the intent of the drafters of the exclusions at issue; (2) to prove the latent ambiguity

mere fact that the plaintiff moved for summary judgment on certain theories of liability, therefore, should not have barred it from discovery on all theories of liability.

Second, the majority makes no reference to the record for its bold assertion that the plaintiff sought discovery on the insurance commission filings only to demonstrate the intent of the drafters of the provision. Instead, the majority merely notes that the plaintiff, in its memorandum of law in support of its motion for partial summary judgment, had cited *Gerrish Corp.* v. *Universal Underwriters Ins. Co.*, 947 F.2d 1023 (2d Cir. 1991), cert. denied, 504 U.S. 973, 112 S. Ct. 2939, 119 L. Ed. 2d 564 (1992). *Gerrish Corp.*, however, does not support the majority's conclusion for two reasons. First, *Gerrish Corp.* did not even address the evidentiary value of an insurance filing as a measure of the intent of the exclusion's drafters. Rather, *Gerrish Corp.* held that the terms of an insurance policy had been amended by a filing made with the state insurance commission by an agent of the insurer. Second, the plaintiff obviously cited *Gerrish Corp.* merely to demonstrate the importance of allowing discovery on these filings. Indeed, the plaintiff introduced its discussion of that case by noting: "Perhaps the most recent example of the value of discovery in these cases is *Gerrish* [*Corp.*] . . . ."

Finally, it is settled law that discovery is to be liberally allowed, and that a party may seek discovery on any issue that is "material to the subject matter involved in the pending action" and "if the disclosure sought would be of assistance in the prosecution or defense of the action." Practice Book § 218. Indeed,

in the policies; (3) to determine the representations made by [the] defendants, or their agents, in marketing the exclusions or in submitting them to state insurance officials; and (4) to determine what pollution exclusion, if any, is contained in the National Union policy."

"[i]t shall not be ground for objection that the information sought will be inadmissible at trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence." Practice Book § 218. Under this standard, the trial court should have allowed the plaintiff to conduct discovery on the issue of the defendants' filings with the state insurance commission.

Accordingly, I respectfully dissent.